[Civ. No. 39210. First Dist., Div. One. Jan. 6, 1978.]

ROBERT M. EMERSON, Plaintiff and Appellant, v.
J. F. SHEA COMPANY, INC., Defendant and Respondent.

**COUNSEL**

Bohnett, Bohnett, Weber & De Vries and Donald J. De Vries for Plaintiff and Appellant.

Danaher, Gunn & Klynn and Michael Klynn for Defendant and Respondent.

## Opinion

**SIMS, J.**—Plaintiff, the president of a local improvement association, has appealed from a stipulated judgment which awarded him $100 on his complaint, in which he sought injunctive relief, compensatory and punitive damages from defendant and respondent developer, and others, for willful noncompliance with the Federal Fair Credit Reporting Act (15 U.S.C. §§ 1681-1681t) and for invasion of his privacy. Pursuant to the stipulation, he seeks review of an order of the trial court which granted the developer's motion for partial summary judgment on the issue of punitive damages.[1] He contends that the trial court erred in concluding that the provisions of the federal act require a showing of malice before punitive damages may be awarded, and that, in any event, the record before the court, at the time it made its order for partial summary judgment, demonstrated that there was a triable issue of fact as to whether the developer acted with oppression, fraud or malice, express or implied, as prescribed by state law. (Civ. Code, § 3294.) In resolving these issues we are faced with differences of opinion voiced by the parties concerning the effect of the stipulated judgment, with respect to this court's scope of review of an order for partial summary judgment,

---

[1]The stipulation reads: "Judgment in this action may be entered in favor of plaintiff, ROBERT M. EMERSON, and against defendant, J. F. SHEA CO., INC., dba CENTURY COMMUNITY DEVELOPERS, in the amount of One Hundred Dollars ($100.00), as to all issues raised in the first amended complaint and as to all issues raised in the pretrial conference order, upon the following additional terms and conditions: [¶] 1. The cross-complaint and all amendments thereto on file herein shall be severed and ordered off calendar. In the event plaintiff shall prevail on appeal of the order granting partial summary judgment, then and in such event cross-complainant may move to restore the severed cross-complaint to the civil active list, and upon such restoration both sides stipulate and agree that such cross-complaint may be consolidated for trial with the trial on the issue of punitive damages. In the event that plaintiff shall not prevail on appeal from the order granting partial summary judgment or in the event there shall be no trial ordered by the appellate court on the issue of punitive damages, then cross-complainant shall forthwith dismiss its cross-complaint in its entirety with prejudice. [¶] 2. Except as herein provided, each side waives Findings of Fact, Conclusions of Law, the right to make a Motion for New Trial and all right to appeal this Judgment. [¶] 3. Plaintiff expressly reserves the right to appeal only from that certain order granting partial summary judgment heretofore ordered by the Honorable STANLEY R. EVANS which denied plaintiff the right to seek punitive damages herein, and which is hereby confirmed pursuant to CCP §437c. [¶] 4. Each party hereto waives the two-year and five-year dismissal statutes as to all phases of this proceeding. [¶] 5. Each party hereto waives any right to attorney's fees and/or costs of suit in connection with this judgment as to all amounts heretofore incurred. [¶] 6. [The action was dismissed with respect to two of the developer's employees and a related corporation.]"

A further cause of action against the credit bureau which furnished the information which the developer allegedly improperly sought, apparently had been severed from the charges against the developer and is not involved in this appeal.

and with respect to the interpretation of federal law, and the state law of privacy.

We conclude that the stipulated judgment neither adds nor detracts from the validity of the trial court's order for partial summary judgment. It must stand on the record made at that time; that the federal act must be interpreted under federal, not state, law; that the plaintiff failed to produce any facts which would give rise to punitive damages for invasion of privacy, or for punitive damages under the Federal Fair Credit Reporting Act. The court properly ordered partial summary judgment, and the judgment must be affirmed.

Defendant developer subscribed to a credit bureau in 1970. In March 1971 it received from the credit bureau a copy of the Federal Fair Credit Reporting Act which was to become effective April 26, 1971. (15 U.S.C. §§ 1681-1681t.) The act requires in respect to "Compliance Procedure" ". . . These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose. . . ." (§ 1681e.) A covering letter advised the customer of the legal requirements of the act, and instructions were given concerning the use of security digits to obtain credit information.

The "Permissible Purposes of Reports" are listed in section 1681b.[2] It was in effect stipulated that none of the purposes other than an alleged "legitimate business need," were involved in the defendant's subsequent inquiry.

In the spring of 1974 the developer, through a subsidiary, was developing a project for single family residences in San Jose. The plaintiff owned a residence on Nancarrow Way and was president of a

---

[2]Section 1681b reads: "A consumer reporting agency may furnish a consumer report under the following circumstances and no other: [¶] (1) In response to the order of a court having jurisdiction to issue such an order. [¶] (2) In accordance with the written instructions of the consumer to whom it relates. [¶] (3) To a person which it has reason to believe—[¶] (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or [¶] (B) intends to use the information for employment purposes; or [¶] (C) intends to use the information in connection with the underwriting of insurance involving the consumer; or [¶] (D) intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or [¶] (E) otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer."

local homeowners' association in the area behind which the development was being constructed. In plaintiff's area development had been pursued on 8,000-square-foot lots as required by existing zoning regulations. The developer, however, had taken advantage of a low density cluster procedure, which permitted, without public hearing, a reduction of lot size, in this case to 6,000 square feet, in return for additional public open space, here dedication of certain land for a park. The plaintiff was concerned that the reduction of lot sizes would reduce property values in his area and would result in buildings so close to his rear property line as to compromise his privacy. He and his neighbors were also concerned about the height of the structures to be erected.

Plaintiff's first contact with the developer was a short conversation with the superintendent on the job concerning a drainage ditch.

On April 29, 1974, as president of the homeowners' association, he wrote a letter to the division manager of the developer expressing his concern about the development to the rear of his property and requesting a meeting to resolve the areas of controversy. The letter threatened legal action if satisfactory arrangements were not effected. In response the manager on May 1, 1974, asked the company engineer to arrange a meeting with the plaintiff and the city planning commission to explain the circumstances resulting in reduced lot sizes to plaintiff. During the ensuing period the plaintiff telephoned the manager on perhaps six occasions for the purpose of discussing the proposed meeting.

The meeting took place on May 9, 1974, and was attended by plaintiff and two friends, the developer's engineer, and two members of the staff of the planning department. Plaintiff denied that he at any time accused anyone of blackmail, bribery or anything of that nature. The depositions of the six other participants were taken, but they leave it uncertain as to the express terminology employed by plaintiff in attacking the grant of the reduced lot size. It is clear that plaintiff complained of a transaction whereby the developer secured smaller, and therefore more, building sites, by donating what was termed a rock pile to the city. It did appear that the city itself had suggested low density cluster zoning in exchange for dedication for the park land. The witnesses' testimony as a whole leaves it unclear but suggests, that plaintiff was claiming an impropriety on behalf of the city or the developer or both. In any event, the engineer reported in a letter to the manager that the homeowner's president "said he thought [the developer's subsidiary] had blackmailed the City by

giving them the useless rockpile for a park in order to get reduced lot sizes." He also noted that the plaintiff again threatened legal action.

Upon receipt of this letter the manager deemed it prudent to know more about the plaintiff in order to protect the developer's business interests, which he considered threatened by an attack on its reputation. In his deposition he stated, "Sometimes, when I get characters like [plaintiff] calling me and harassing me, I like to find out who he is. . . . You get a flaky letter like that, you want to know who you're dealing with, I just want to know who he is. I want to know whether he lives near the property. I want to know what valid reason he has for writing me a letter like this." His secretary also volunteered that perhaps the manager wanted to find out whether the homeowner's president had any "political pull" since housing projects of that nature were their "bread and butter." Accordingly, the manager directed the secretary to call the credit bureau and find out by whom the plaintiff was employed.

On May 16, 1974, the secretary telephoned, and gave appropriate code numbers to the operator at the credit bureau. She asked for a verbal report on the plaintiff. At that time the secretary was advised that the file on plaintiff's name was a mixed file containing information on two persons of the same name; that he was either a jewelry representative or a city administrator, and no accurate information could be given. The secretary relayed this information to the manager and he instructed her to drop the matter and not seek any more information.

On June 11, 1974, the plaintiff had occasion to visit the credit bureau in order to straighten out his file. At that time he learned of the developer's inquiry of May 16. A representative of the credit bureau phoned the developer's office and received confirmation from the manager's secretary that such an inquiry had been made. At the same time plaintiff secured a letter from the credit bureau manager verifying that the May 16 inquiry had been made. The letter indicated that as a matter of course a corrected report based upon the revised file would be sent to the developer. Plaintiff interposed no objection.

The plaintiff's evidence reflected that he in fact is a jewelry salesman, and for various reasons including, presumably, his physical well being as a target of robbery, his employment and occupation are very personal to him. When, on June 11, he found out that the developer had made the inquiry of the credit bureau, he became frustrated and could not believe it. It was reflected in his work immediately. He could not think of

anything else, and his sales went down. He could not sleep at night and he was very upset. His business trip after ascertaining that inquiry had been made was disastrous; he had his mind on the inquiry during that time and was not functioning properly.

On June 27, 1974, plaintiff filed the present action.

Thereafter in the ordinary course of business, without further request from the developer, and there having been no objection interposed by plaintiff, despite his notification that the credit bureau intended to do so, a full credit report was forwarded to the developer and received by it July 15, 1974. The written report included plaintiff's employment, his wife's employment, a list of his charge accounts, the balances, his credit rating by eight different stores and commercial enterprises, and other information. Since suit had been filed it was forwarded to the developer's attorneys without being examined by the manager or his secretary. The developer, believing itself obligated to do so, paid for the credit report. Meanwhile, on July 12, 1974, the developer was suspended from membership in the credit bureau because of the litigation involving its inquiry of May 16, 1974.

The foregoing facts are found in declarations submitted by the parties in connection with the defendant's motion for summary judgment or in the alternative for partial summary judgment, and in plaintiff's response thereto and his motion for summary judgment. The court granted the defendant's motion for summary judgment "on all factual issues raised by Plaintiff relating to punitive damages, there being no triable issue of fact on said issues"; and it denied the remainder of the relief sought by the parties' motions. Following the entry of an order for partial summary judgment, the parties stipulated for judgment as outlined above (see fn. 1), and this appeal ensued.

## I

The stipulation recites, "Judgment in this action may be entered in favor of plaintiff . . . and against defendant . . . in the amount of One Hundred Dollars ($100.00) as to all issues raised in the first amended complaint and as to all issues raised in the pretrial conference order, upon the following additional terms and conditions . . . ." (See fn. 1.) Plaintiff construes this as a judgment in his favor as to each issue raised in the first amended complaint and in the pretrial conference order, excepting, however, the issue of punitive damages, which concededly

had been disposed of by the court's order for partial summary judgment, and was expressly reserved for appeal.

On the other hand, the defendant asserts that the principal and only purpose of the stipulated judgment was to dispose of the other issues, so that there would be an appealable judgment to secure review of the court's earlier ruling. The stipulation waiving findings of fact and conclusions of law leaves the matter undetermined.

The issue is important because punitive damages are not awarded as a matter of course for every violation of the federal act. Sections 1681n and 1681o distinguish between the civil liability of user of information which "willfully fails" to comply with any requirement imposed under the act, and a user which "is negligent in failing" to so comply.[3] Concededly the issues raised in the first amended complaint and in the pretrial conference order were (1) willful noncompliance with the federal act, (2) negligent noncompliance with the federal act, and (3) common law invasion of privacy. When the defendant confessed judgment in the sum of $100 in satisfaction of plaintiff's right to compensatory damages under each and all of those claims it did not of necessity concede the validity of the plaintiff's claims on each issue. In other words, at this stage of the proceedings the burden is on the plaintiff to show that the evidence before the trial court revealed facts, which if believed, would bring the case within section 1681n.

In granting the motion for partial summary judgment the trial court stated, "Well, I think that a recovery of punitive damages would have to involve the elements that are normally required in California for punitive damages, and I don't think on the evidence that we have to rule on in this motion that there is evidence of that intent to vex, injure, annoy the Plaintiff." Insofar as this statement implies an intent to engraft the provisions of California Civil Code section 3294 onto federal law, it is

---

[3]Section 1681n provides: "Any consumer reporting agency or user of information which willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—[¶] (1) any actual damages sustained by the consumer as a result of the failure; [¶] (2) such amount of punitive damages as the court may allow; and [¶] (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court."

Section 1681o reads: "Any consumer reporting agency or user of information which is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—[¶] (1) any actual damages sustained by the consumer as a result of the failure; [¶] (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court."

erroneous. The act confers jurisdiction to enforce civil liabilities under the act in a United States District Court or "in any other Court of competent jurisdiction . . . ." (15 U.S.C. § 1681p.) This grant of concurrent jurisdiction is not intended to create rights subject to 50 different rules of interpretation, but merely creates a more convenient forum for those individuals who have been injured by noncompliance with the act. It is basic that the substantive rights created by federal law are controlled by that law. It is only in matters of procedure and practice that the states, given concurrent jurisdiction over actions created by federal law, may assert their local law. (See *Free* v. *Bland* (1962) 369 U.S. 663, 666 [8 L.Ed.2d 180, 183, 82 S.Ct. 1089]; *Carlson* v. *Pacific Far East Lines* (1973) 29 Cal.App.3d 883, 886-889 [105 Cal.Rptr. 885]; and *Ackerley* v. *Credit Bureau of Sheridan, Inc.* (D.C. Wyo. 1974) 385 F.Supp. 658, 661.) In the case last cited the court stated: "The remedies provided by the Act are of a federal statutory nature, and thus defendant's contention that any right to relief in the form of damages is to be determined by state court decisions is ill-taken." (385 F.Supp. at p. 661.)

On the other hand the trial court, in an attempt to construe the federal statute's distinction between a willful failure to comply, and a negligent failure to comply with the provisions of the act, may have been drawing an analogy from California law between cases of ordinary negligence where no punitive damages are recoverable (see *Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 526-530 [322 P.2d 933]) and the cases under Civil Code section 3294 where the defendant has been guilty of such oppression, fraud or malice, express or implied, as will justify punitive damages. In the latter case he was attempting to construe federal law. The propriety of that interpretation is reviewed below. (Part III, *infra.*)

In any event we cannot determine whether the court in denying all of the defendant's motion for summary judgment believed that plaintiff's right to go to trial on the issue of compensatory damages rested on a right to recover for negligent noncompliance with the federal act, on an alleged erroneous limitation on the right to recover for willful noncompliance with the act, or on a basic invasion of privacy without malice.

Plaintiff contends that discussions at the time of entry of judgment establish that inherent in the judgment is a finding that there was a willful failure to comply with the act. On inquiry by defense counsel, the court indicated that there were purposes for the stipulated judgment other than merely to provide a final judgment from which an appeal

could be taken as to the partial summary judgment part, and counsel acquiesced.[4] At the same time the court asked the plaintiff personally if he concurred in the agreement embodied in the stipulation. The plaintiff advised the court, "I have a question, Your Honor, . . . on my mind. Does this judgment in layman's language, admit that [the developer] has invaded my privacy?" The court replied, "You felt that they have, and based on that feeling you brought a complaint against them saying that they have, seeking damages. Now they have agreed that judgment may be rendered in your favor on that complaint, awarding damages." At the court's request counsel for defendant indicated his agreement with that statement.

Neither of these admissions by the defendant indicates that it had conceded that, nor that the judgment established that, a willful noncompliance with the federal act, as contemplated by section 1681n entitling the plaintiff to punitive damages, had occurred. All we can gather from the four corners of the stipulation and judgment is that the plaintiff surrendered his rights to compensatory damages under the various theories advanced, in return for the $100 judgment, reserving the right to appeal and further litigate the issue of his right to punitive damages. The question of the plaintiff's right to punitive damages must be determined from the record made in connection with the motions, without any aid from the stipulation or the judgment entered thereon.

## II

Plaintiff, in support of his cause of action for violation of his right of privacy and the right to recover punitive damages because of the developer's invasion of that right, relies upon the provisions added to section 1 of article I of the California Constitution in 1972, and reiterated in the revision of the article in 1974. It now reads, "All people are by nature free and independent, and have certain inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." In *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94,

---

[4]"[Attorney for Defendant]: The purpose of this proceeding is to allow the plaintiff to appeal the punitive damage issue? That is what we are here for? I am not trying to trick you. [¶] The Court: No. One of the purposes of this agreement that you have reached is to provide a final judgment from which an appeal can be taken as to the partial summary judgment portion thereof only. [Attorney for Defendant]: Correct. [¶] The Court: That is one of the purposes. There are, of course, other purposes being served. [Attorney for Defendant]: That is a correct statement. [Attorney for Plaintiff]: Surely. The Court: Yes."

533 P.2d 222], the court reviewed the purpose of the 1972 amendment in the light of the statement drafted by the proponents of the provision and included in the election brochure. It concluded: "Several important points emerge from this election brochure 'argument,' a statement which represents, in essence, the only 'legislative history' of the constitutional amendment available to us. First, the statement identifies the principal 'mischiefs' at which the amendment is directed: (1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records. Second, the statement makes clear that the amendment does not purport to prohibit all incursion into individual privacy but rather that any such intervention must be justified by a compelling interest. Third, the statement indicates that the amendment is intended to be self-executing, i.e., that the constitutional provision, in. itself, 'creates a legal and enforceable right of privacy for every Californian.' " (13 Cal.3d at p. 775, fn. omitted. See also *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 832 [134 Cal.Rptr. 839].)

Here the plaintiff recognizes the necessity for the legitimate collection of information bearing on his credit by the credit agency. He complains, however, that information, properly collected for that purpose, was improperly secured by the developer for the sinister purpose of silencing him as an individual, disparaging him in the community, and attacking him as president of the homeowners' association, so that the association and its opposition to the development could be buried forever.

There is nothing in the record to sustain the foregoing charges. All that appears is that the developer sought to ascertain something concerning the identity of a person who appeared to be questioning the probity of the proceedings which .had resulted in the approval of its planned development, and who was threatening to sue it. This case bears no resemblance to the reported activities of our largest domestic automobile manufacturer in investigating and harassing its most persistent critic. There is no evidence to show that the developer sought to develop further information concerning plaintiff, whether derogatory or favorable, or that it ever disseminated or otherwise used any information concerning plaintiff for any purpose whatsoever. Under those circumstances it is questionable whether the award of nominal compensatory

damages, if appealable, could have been sustained, much less an award of punitive damages. (Cf., however, *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d 825, 832.)

■ We recognize that an unreasonably intrusive investigation is a tort for which damages are recoverable. (See *Noble* v. *Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 659-660 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164].) The test is what is objectionable or offensive to the reasonable man. (*Id.*) ■ Here the plaintiff, by his argument that the developer should have telephoned and asked him his occupation, has in effect admitted that it is not objectionable or offensive to seek to determine the identity and occupation of a potential legal adversary.

■ Since there was no general disclosure in this case there was no violation of the so-called "public disclosure of private facts" branch of the tort of invasion of privacy. (See *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d 825, 828-829; *Timperley* v. *Chase Collection Service* (1969) 272 Cal.App.2d 697, 700-701 [77 Cal.Rptr. 782]; and *Grimes* v. *Carter* (1966) 241 Cal.App.2d 694, 698-699 [50 Cal.Rptr. 808, 19 A.L.R.3d 1310]. Cf. *Gill* v. *Hearst Publishing Co.* (1953) 40 Cal.2d 224, 228-229 [253 P.2d 441]; *Gill* v. *Curtis Publishing Co.* (1952) 38 Cal.2d 273, 276-280 [239 P.2d 630]; *Fairfield* v. *American Photocopy etc. Co.* (1955) 138 Cal.App.2d 82, 85-87 [291 P.2d 194]; and Civ. Code, § 43.) In the cases last cited the test is whether the offending party's conduct is such that he should have realized that it would be offensive to persons of ordinary sensibilities. (*Gill* v. *Hearst Publishing Co., supra,* 40 Cal.2d 224, 229; and *Gill* v. *Curtis Publishing Co., supra,* 38 Cal.2d 273, 280.) ■ The developer cannot be charged with offending the plaintiff's sensibilities because it instituted an inquiry into his occupation, when plaintiff, himself, indicates he would have divulged that information in a phone call.

■ We further note that even under the doctrine last discussed, a person by his own activities or by force of circumstances, may become a public personage, and thereby relinquish a part of his right of privacy to the extent that the public has a legitimate interest in his doings, affairs or character. (See *Carlisle* v. *Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 747 [20 Cal.Rptr. 405]; and *Smith* v. *National Broadcasting Co.* (1956) 138 Cal.App.2d 807, 811-812 [292 P.2d 600].) ■ So here, by taking up the cudgels for his neighbors, by undertaking to influence public officials in their favor, and by threatening to sue the developer, the plaintiff made himself a public figure in a sense. It is true

the arena was small, but the interest in his character and the nature of his employment certainly extended to those members of the public which included the developer he was attacking.

In the same view we note that the court in *White* v. *Davis, supra,* 13 Cal.3d 757, recognized: ". . . the statement makes clear that the amendment does not purport to prohibit all incursion into individual privacy but rather that any such intervention must be justified by a compelling interest." (13 Cal.3d at p. 775. See also *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 864 [132 Cal.Rptr. 464, 553 P.2d 624] [cert. den.]; and *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d 825, 832.) Application of such an exception involves a balancing of interests. The plaintiff's alleged invasion here presumes that he can adopt the public posture noted above without exposing himself to some invasion of privacy. Such is not the case. (See *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 670-672 [114 Cal.Rptr. 345, 522 P.2d 1345].)

There is broad language in *Fairfield* v. *American Photocopy etc. Co., supra,* 138 Cal.App.2d 82, which appears to furnish some support to plaintiff. The court stated: "The motives of a person charged with invading the right [of privacy] are not material with respect to the determination whether there is a right of action, and malice is not an essential element of a violation of the right." (138 Cal.App.2d at p. 87.) It added, "Plaintiff is entitled to compensation for injury to his peace of mind and to his feelings. The recoverable compensation for these items is difficult to determine since they afford no definite criteria for the ascertainment of damages. In a case of this character there can be no direct evidence of the amount of damages sustained, nor the amount of money which will compensate for the injury. The measure of damages therefore is for the trier of fact, and in assessing such damages he is accorded a wide and elastic discretion." (*Id.,* p. 88.) The foregoing statements must be read in connection with the facts of that case, which are stated as follows: "Defendant, without plaintiff's consent, advertised far and wide that plaintiff was a satisfied user of the machine. Plaintiff was not a satisfied user. The representation was false. The record warrants the inference that when defendant circulated the advertisement it knew plaintiff was not a satisfied user. The advertisement amounted to a pretended endorsement or recommendation of defendant's product. It was an unauthorized and unwarranted appropriation of plaintiff's personality as a lawyer for pecuniary gain and profit. The advertising use of plaintiff's name, without his consent, is comprehended within the

narrowest definition of the right of privacy." (138 Cal.App.2d at p. 87.) Here no such charges were alleged and proved.

The alleged damages in this case were not occasioned by any publicity given to plaintiff's occupation by the developer. As we have noted there is not a scintilla of evidence to reflect any harassment of plaintiff by that defendant. His paranoiac concern with the revelation of his occupation was not warranted by anything that is in the record. He cannot claim that the developer was seeking information to turn a robbery ring against him. His fears cannot be justified as ordinary sensibilities to the slight revelation that was effected in this case. In *Carlisle* v. *Fawcett ·Publications, Inc., supra,* 201 Cal.App.2d 733, the court concluded: "While plaintiff is entitled to a sympathetic understanding of his desire not to have publicized the details of his early marriage, we must hold, for the reasons stated, that he has no cause of action for an invasion of his right of privacy. As is said in *Davis* v. *General Finance & Thrift Corp.,* 80 Ga.App. 708 [57 S.E.2d 225, 227]: '. . . the protection afforded by the law to the right of privacy must be restricted to "ordinary sensibilities" and· not to supersensitiveness or agoraphobia. (41 Am.Jur., § 12, pp. 934-935.) There are some shocks, inconveniences and annoyancies [*sic*] which members of society in the nature of things must absorb without the right of redress.' " (201 Cal.App.2d at p. 748.)

From the foregoing we can but conclude that plaintiff has recovered at best more than he was entitled to for any alleged invasion of privacy.

If we were to assume, contrary to our conclusion (part I above) that the stipulated judgment established that there was an invasion of privacy, we still find a paucity of proof to establish punitive damages on that cause of action. ██ It is true that exemplary damages are awarded to serve as an example or warning to others not to engage in conduct found to be proscribed by Civil Code section 3294. (*Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270 [95 Cal.Rptr. 678].) The amount of such damages is a matter generally within the discretion of the jury. (*Ferraro* v. *Pacific Fin. Co.* (1970) 8 Cal.App.3d 339, 350-352 [87 Cal.Rptr. 226].) "In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ. Code, § 3294.) He must act with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights. [Citations.] While we have concluded that defendant violated its duty of good faith and fair dealing, this alone does not necessarily establish that defendant acted with the requisite intent to injure plaintiff." (*Silberg* v. *California Life Ins. Co.*

(1974) 11 Cal.3d 452, 462-463 [113 Cal.Rptr. 711, 521 P.2d 1103]. Cf. *Toole* v. *Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 711-717 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) ▇▇ We reiterate, the record fails to sustain plaintiff's conclusion that the developer's inquiry was designed to come within the requirements last set forth. No other conduct has been shown.

Plaintiff's reliance on cases involving abuse of process (see *Spellens* v. *Spellens* (1957) 49 Cal.2d 210, 230-233 [317 P.2d 613]; and *Tranchina* v. *Arcinas* (1947) 78 Cal.App.2d 522, 524-527 [178 P.2d 65]), similarly fails for lack of supporting evidence to show that the developer used the muddled information which it received for any improper purpose.

There was no error in granting summary judgment on plaintiff's cause of action for punitive damages for invasion of privacy.

## III

We return to examine the plaintiff's rights under the Federal Fair Credit Reporting Act. (15 U.S.C. §§ 1681-1681t. Cf. Cal. Civ. Code, §§ 1785.1-1785.34 and former §§ 1750-1757 and 1785.1-1785.8; Stats. 1970, ch. 1348, § 1; and Stats. 1973, ch. 167, § 1.) The law prior to that enactment, as found in this state, is set forth in *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412 [42 Cal.Rptr. 449, 398 P.2d 785], as follows: "A majority of other jurisdictions which have considered the question hold that the reports of mercantile agencies are privileged if made without malice to one who has an interest in the matters communicated [citation], and when such reports meet the requirements of section 47, subdivision 3 [of the Civil Code], they should be accorded the privilege set forth in that section. In determining whether a defendant may take advantage of the privilege, it has been held that malice may be inferred if the defendant does not have reasonable or probable cause to believe his statement to be true. [Citations.]" (62 Cal.2d at p. 418. See also *Krumholz* v. *TRW, Inc.* (1976) 142 N.J.Super. 80, 84 [360 A.2d 413, 415-416].)

In enacting the legislation Congress declared: "It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in

accordance with the requirements of this subchapter." (§ 1681, subd. (b). See also, Note, *The Fair Credit Reporting Act* (1972) 56 Minn.L.Rev. 819; and Note, *Consumer Protection: Regulation and Liability of the Credit Reporting Industry* (1972) 47 Notre Dame Law. 1291.)

In upholding the constitutionality of the act, the United States Court of Appeals of the Eighth Circuit, stated, "Accordingly, Congress's authority to legislate that O'Hanlon 'follow reasonable procedures to assure maximum possible accuracy,' § 1681e(b), and 'clearly and accurately disclose to the consumer' the information in its files, § 1681g, was proper. Likewise, Congress had authority to fix liability, including punitive damages and attorney fees, for willful violations of those requirements. O'Hanlon's challenge to the constitutionality of the Act is, we submit, without merit." (*Millstone* v. *O'Hanlon Reports, Inc.* (8th Cir. 1976) 528 F.2d 829, 833.) Principal emphasis has been on the protection of consumers from inaccurate or arbitrary information in a consumer report which is used as a factor in determining an individual's eligibility for credit, insurance or employment. (See *Ley* v. *Boron Oil Co.* (W.D.Pa. 1976) 419 F.Supp. 1240, 1242-1243; *Collins* v. *Retail Credit Co.* (E.D. Mich. 1976) 410 F.Supp. 924, 931-932; *Hansen* v. *Morgan* (D.C.Idaho 1976) 405 F.Supp. 1318, 1319-1320; *Belshaw* v. *Credit Bureau of Prescott* (D.C.Ariz. 1975) 392 F.Supp. 1356, 1359; *Ackerley* v. *Credit Bureau of Sheridan, Inc., supra,* 385 F.Supp. 658, 659-660; and *Rasor* v. *Retail Credit Company* (1976) 87 Wn.2d 516, 520 [554 P.2d 1041, 1045].) It is generally recognized that the act does not apply to commercial credit reports issued for purposes other than "establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of [the act]." (See fn. 2 above.) (§ 1681a(d); *Wrigley* v. *Dun & Bradstreet, Inc.* (N.D.Ga. 1974) 375 F.Supp. 969, 970; *Sizemore* v. *Bambi Leasing Corporation* (N.D.Ga. 1973) 360 F.Supp. 252, 253-254; and *Krumholz* v. *TRW, Inc., supra,* 142 N.J.Super. 80, 84 [360 A.2d 413, 415].)

In *Ley* v. *Boron Oil Co., supra,* 419 F.Supp. 1240, the defendant, as was the developer in this case, was threatened with litigation. It requested its credit manager to find out who the writer of a letter was, and the credit manager ordered a credit report from a commercial credit agency. The plaintiff was interviewed and declined all information. He then brought suit for violation of the federal act. In granting the defendant's motion to dismiss, the court concluded that the report which formed the basis for the suit was not an investigative consumer report within the provisions of

section 1681a(d). It stated, "Whether a report by a consumer reporting agency on a consumer is a 'consumer report' under the Act depends, therefore, on the contents of the report and the purpose of the report. . . . [¶] The very purpose of the present inquiry and the information contained in the report in question does not relate to consumer credit as outlined in the statement of purpose of the statute. The report indicates that plaintiff is an attorney who maintains a private law office, but he is employed by the United States Steel Company. It recites his residence, marital status, age and absence of any civil or criminal court records concerning him. Thus the report was not sought for credit purposes and gives no credit information, but rather was sought to establish the identity of the person writing the letter in the capacity of an attorney-at-law, representing parties who threatened a lawsuit against Boron Oil Company. Because the recipient of the letter, Boron Oil Company, had known another attorney as representing the claimants and could not find the writer of the letter listed as an attorney under the listings in the Pittsburgh Telephone Directory, it instituted an inquiry to learn of his identity. The report does not relate to the extension of credit or other benefits to the plaintiff as a consumer. It is thus not a 'consumer report' under the statute." (419 F.Supp. at p. 1242.) The court also reviewed the legislative history of the act and the interpretation given it by the Federal Trade Commission, and concluded: "It is clear that the statute regulates the reporting of credit matters involving individuals as consumers, and was not meant to cover business credit reports pertaining to the business activities of the person reported on. It is also clear from the evidentiary material supplied by the parties on both sides here that it was the business or professional standing of an attorney who threatened suit and invited negotiations which was the subject matter of the inquiry and the report." (419 F.Supp. at p. 1243.)

Similarly, a report prepared in connection with a mother's attempt to secure increased child support and medical expenses from the child's father has been held to not be a "consumer report" within the terms of the federal act. (*Gardner* v. *Investigators, Inc.* (M.D.Fla. 1976) 413 F.Supp. 780, 781-782.)

In *Hansen* v. *Morgan, supra,* 405 F.Supp. 1318, a candidate, successful in securing election to Congress, found that a credit report secured by the defendant jewelers and delivered to his primary election opponent, had found its way into the hands of a House Committee investigating the congressman's campaign financing. It was alleged that the jewelers had willfully and negligently failed to comply with the provisions of the

federal act. The court rendered summary judgment for the defendants. It analyzed the statute as follows: "Section 1681 states the congressional findings and purpose. Section 1681a is a definition section. Section 1681b relates solely to consumer reporting agencies, and not to users, as the defendants here were. The same is true of section 1681c. Section 1681d refers solely to investigative reports. The report here involved is not an investigative report. Sections 1681e, f, and g relate solely to consumer reporting agencies, as do subsections 1681h(a), (b), (c), and (d). Subsection 1681h(e) will be considered more fully in answer to the claim on which plaintiffs most strongly rely. Sections 1681i, j, k, and *l* relate to consumer reporting agencies. Section 1681m does impose duties on the user but only in those cases where, as a result of information received from a credit reporting agency, or others, credit has been denied or the charge for it increased. No credit was involved here. Defendants did not violate any of the sections or subsections of Section 1681 imposing duties." (405 F.Supp. at p. 1319.)

Section 1681h, subdivision (e), provides: "Except as provided in sections 1681n and 1681*o* of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, except as to false information furnished with malice or willful intent to injure such consumer." The court continued: "As indicated, the Act does impose upon consumer reporting agencies, and upon the users of consumer reports, certain duties. Sections 1681n and *o* provide remedies conditioned upon either wilful or negligent failures to comply with the imposed duties. However, in the absence of a violation of some other section of the Act, there is no liability under Sections 1681n and *o*. If it was the congressional intent that Subsection 1681h(e) should extend the liability imposed by Sections 1681n and *o*, then the extension goes no further than to create a right where false information is furnished with malice or wilful intent to injure." (405 F.Supp. at pp. 1319-1320.)

*Belshaw* v. *Credit Bureau of Prescott, supra,* 392 F.Supp. 1356, involved an action against a credit bureau and a law firm charging that defendants caused investigative consumer reports and/or consumer reports to be made about plaintiff without complying with the act, and that the practices utilized in making and using these reports invaded his privacy. In examining the claim against the credit bureau the court rejected the

contention that the act was inapplicable because the user, the defendant law firm, did not intend to use the report for any of the purposes enumerated in part (3) of section 1681b. (See fn. 2 above.) The court observed, "Congress' concern was to protect consumers from the misuse of information acquired by credit reporting agencies. The Act cannot be interpreted as applicable to the activities of credit reporting agencies only when the consumer applies for credit, insurance, or employment, leaving them otherwise free to continue the very practices the Act was designed to prohibit. The Act would afford little protection for the privacy of a consumer if it only regulated credit reporting agencies in the area of their legitimate business activities but left them free to continue their clandestine activities in other areas." (392 F.Supp. at p. 1359.) It concluded: "In order for § 1681b(3) to be meaningful, 'consumer report' must be interpreted to mean any report made by a credit reporting agency of information *that could be used* for one of the purposes enumerated in § 1681a. Only then can § 1681b be given the meaning Congress intended. Section 1681b states the purposes for which such reports legitimately may be used. Its clear implication is that there are some purposes for which consumer reports may *not* be furnished. [¶] If the Act is read in this manner, plaintiff's first claim presents the issue whether defendant Credit Bureau violated §§ 1681b, 1681e, 1681g, 1681n, and 1681o of the Act." (*Id.,* pp. 1359-1360.) The credit bureau's motion to dismiss was denied.

The court did dismiss the plaintiff's claim against the law firm. It stated, "Plaintiff's second claim for relief alleges that defendant Favour & Quail violated §§ 1681b, 1681d, 1681e and 1681g of the Act. Section 1681d requires the procurer of an investigative consumer report to disclose to the consumer that a report on him may be made. However, counsel for plaintiff conceded that there was only one consumer report prepared. Since no investigative consumer report was procured, § 1681d of the Act could not have been violated. Defendant Favour & Quail cannot have violated §§ 1681b, 1681e or 1681g, because it is not a consumer reporting agency as defined by § 1681a(f) of the Act. Accordingly, plaintiff's second claim must be dismissed against defendant Favour & Quail." (*Id.,* p. 1361. Cf. *Beresh* v. *Retail Credit Co., Inc.* (C.D.Cal. 1973) 358 F.Supp. 260, 261-262.)

The foregoing precedents indicate that the plaintiff secured more relief than he was entitled to under the federal act, when he recovered the $100 stipulated judgment. It must be borne in mind that at the time the plaintiff discovered that inquiry had been made of the credit bureau

no definite information was available. Having been advised of the inquiry, and of the credit bureau's intention to furnish a credit report, the plaintiff could not sit idly by without protest and then claim his rights were violated by an act done with his implied consent. The law will not permit one to so manufacture a cause of action.

We are mindful that the Federal Trade Commission in the exercise of its jurisdiction to enforce compliance with the act (§ 1681s) has published a pamphlet "Compliance With The Fair Credit Reporting Act." (See 2d ed. 1973, as promulgated by Division of Consumer Credit and Special Programs, Bureau of Consumer Protection, Fed. Trade Com., as reported 5 C.C.H. Consumer Credit Guide, p. 59781 et seq., ¶ 11301 et seq.) Part IV of the pamphlet deals with the compliance obligations on the reporting industry. Part A deals with the subject of consumer reports, and subdivision (3) reviews the purposes authorized under Public Law No. 9031, title VI, section 604 (15 U.S.C. § 1681b). The commission states: "(c) Reports may be issued to a person who has a legitimate business need for the information in connection with a business transaction for personal, family, or household purposes involving the consumer. The legitimate business need category does not include purposes such as marketing research, an attorney investigating prospective jurors, 'protective bulletins' and blacklists. . . ." As has been noted above, the obligation of compliance is one imposed on the credit bureau.

Section 1681q does provide: "Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined not more than $5,000 or imprisoned not more than one year, or both." The record here does not support a finding that the defendant knowingly and willfully obtained the confused information concerning the nature of the occupation of the persons bearing the plaintiff's name by making any false representation to the agency. Even if it did, there would be no right of action in the plaintiff unless false information were developed, and adverse action were taken thereon by the user, or unless the user caused a new consumer investigation report to be made without the consent of or notice to the consumer.

We conclude that there was no error in the trial court's order granting the developer's motion for summary judgment on the issue of whether any triable issue was raised concerning the recovery of punitive damages under the provisions of section 1681n of the Federal Fair Credit Reporting Act.

## IV

The foregoing conclusions render it unnecessary to explore further any differences of opinion among the parties concerning the scope of review of the order granting the motion for summary judgment. The principles are clearly set forth in that portion of section 437c set forth in the margin.[5] In this case there is a voluminous record of interrogatories, depositions, and declarations. The trial court was entitled to and compelled to review all this material. (See *Estate of Kerner* (1969) 275 Cal.App.2d 785, 788-790 [80 Cal.Rptr. 289].) Here the record fails to show any triable issues of fact for punitive damages under either the common law or under the federal act. Plaintiff's surmise and conjecture as to what the developer may possibly have intended to do does not rise to the stature of proof. The trial court properly granted the motion for partial summary judgment. (See *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 284-285 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *Collins* v. *City and County of San Francisco* (1975) 50 Cal.App.3d 671, 674 [123 Cal.Rptr. 525]; *Roman Catholic Archbishop* v. *Superior Court* (1971) 15 Cal.App.3d 405, 410-411 [93 Cal.Rptr. 338]; *Estate of Kerner, supra,* 275 Cal.App.2d 785, 789. Cf. *Stationers Corp.* v. *Dun & Bradstreet, Inc., supra,* 62 Cal.2d 412, 417; *Varco-Pruden, Inc.* v. *Hampshire Constr. Co.* (1975) 50 Cal.App.3d 654, 658-659 [123 Cal.Rptr. 606]; and *Frye* v. *Felder* (1966) 246 Cal.App.2d 136, 138-140 [54 Cal.Rptr. 627].)

---

[5]Section 437c provides in pertinent part: "Such motion shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the admissible evidence set forth in the papers and all inferences reasonably deducible from such evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from such evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.

"Supporting and opposing affidavits or declarations shall be made by any person on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

"If a party is otherwise entitled to a summary judgment pursuant to the provisions of this section, summary judgment shall not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment, except that summary judgment may be denied in the discretion of the court, where the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to such fact; or where a material fact is an individual's state of mind, or lack thereof, and such fact is sought to be established solely by the individual's affirmation thereof.

"If it appears that the proof supports the granting of such motion as to some but not all the issues involved in the action, or that one or more of the issues raised by a claim is admitted, or that one or more of the issues raised by a defense is conceded, the court shall, by order, specify that such issues are without substantial controversy. At the trial of the action the issue so specified shall be deemed established and the action shall proceed as to the issues remaining."

The order for partial summary judgment and the judgment are affirmed.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied January 31, 1978, and appellant's petition for a hearing by the Supreme Court was denied March 16, 1978. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.