[Civ. No. 20650. Fourth Dist., Div. Two. May 18, 1982.]

LAGUNA PUBLISHING COMPANY, Plaintiff and Appellant, v. GOLDEN RAIN FOUNDATION OF LAGUNA HILLS, Defendant and Respondent.

## COUNSEL

W. Mike McCray for Plaintiff and Appellant.

Pacht, Ross, Warne, Bernhard & Sears, Michael D. Koomer, Scott Z. Zimmermann and Carol A. Schneiderman for Defendant and Respondent.

## OPINION

**McDANIEL, J.**—In this case we decide that it violated the plaintiff's free-speech, free-press rights secured under article I, section 2 of the California Constitution when unsolicited, live-carrier delivery of plaintiff's giveaway newspaper was made the object of discriminatory exclusion from Rossmoor Leisure World by defendant Golden Rain Foundation of Laguna Hills. The extent to which plaintiff is entitled to damages, if any, beyond injunctive relief lifting such exclusion, must be resolved at a new trial of issues as later defined.

The action in the trial court was brought by Laguna Publishing Company (plaintiff) against assorted defendants after plaintiff's give-away newspaper, the Laguna News Post, was excluded by way of a denial of entry into Rossmoor Leisure World for unsolicited, free delivery to the residents of Leisure World, a private, residential, walled community where only resident-approved access is permitted through guarded security gates. The defendants named included Golden Rain Foundation of Laguna Hills (Golden Rain), the entity which finally decided to exclude plaintiff's newspaper from Leisure World, and which owns the streets, sidewalks, and other common areas within its boundaries for the benefit of its residents. Also named as a defendant was Golden West Publishing Corp. (Golden West), publisher of the Leisure World News, a give-away type newspaper which *is* and for years has been accorded the exclusive privilege of entry into Leisure World for free, unsolicited delivery to its residents.

The fourth amended complaint upon which the case went to trial, undertook to plead several theories of entitlement to relief. Plaintiff alleged that Golden Rain and Golden West had engaged in a conspiracy in restraint of trade, violative of the Cartwright Act, and that Golden West had also engaged in certain conduct against plaintiff violative of the Unfair Trade Practices Act.

For its part, Golden West cross-complained against plaintiff and its principal, Vernon R. Spitaleri, alleging the latter's violations of the Cartwright Act, the Unfair Trade Practices Act, in addition to other conduct allegedly amounting to unfair competition under the common law.

The respective claims noted were all tried to a jury which resolved the issues raised by the complaint against the plaintiff and resolved those raised by the cross-complaint in favor of Golden West. The latter was awarded $5,000 compensatory and $50,000 exemplary damages.

Otherwise, and of central importance here, the plaintiff asserted that the exclusion of its newspaper from Leisure World constituted a deprivation of its free speech and free press rights secured to it under either the federal or state Constitutions. Based on such assertion, plaintiff prayed for an injunction to lift such exclusion and for money damages either under the federal civil rights statute, 42 United States Code section 1983, or on the basis of a claimed "self-executing" modality under article I, section 2, of the California Constitution.

Procedurally, the manner in which the constitutional issues were presented and resolved was somewhat complex. Nine months before trial, the court granted a defense motion that certain issues of fact be deemed without substantial controversy. They are:

"1. Leisure World of Laguna Hills is a private residential housing project, consisting of dwelling units, streets, maintenance and, other facilities.

"2. All of the real property within Leisure World is privately owned and is used only for private purposes.

"3. Leisure World is not open to the general public.

"4. Entry into Leisure World is restricted to authorized persons who must pass through gates guarded by private security guards.

"5. Since the inception of Leisure World in 1964, only the owners or occupants of real property within Leisure World, or their invitees, have been authorized to enter Leisure World.[1]

"6. There are no business districts or commercial facilities or areas such as stores, shopping centers, office buildings, or the like within Leisure World, nor have there ever been any such districts, areas, or facilities therein.

"7. Beginning in late 1967, and continuing to date, plaintiff has been denied permission to enter Leisure World for the purpose of delivering its newspapers by carrier boy on an unrequested basis."

Item 8, argued as a part of such motion to the effect that exclusion of the Laguna News-Post from Leisure World did *not* violate plaintiff's constitutional rights, was excepted from the order granting the motion. However, the court did grant a later defense motion for an order that plaintiff refrain, in the presence of the jury, from making any reference to its claim of free speech abridgement.

The net legal effect of the later order was the same as if the court had sustained a general demurrer to plaintiff's theory of relief based upon a claimed violation of its constitutional rights of free speech and free press; hence, the jury trial of those issues arising under the respective allegations characterized as violations of the Cartwright Act and the Unfair Trade Practices Act proceeded without recognition of the claimed deprivation of plaintiff's constitutional rights.

After the jury brought in its verdict, the court, sitting in equity, took further evidence on plaintiff's application for an injunction and then denied such application. In support of that denial, it made extensive findings of fact and conclusions of law. In this connection, it is appropriate to observe, in terms of extrinsic, observable events, that there was little if any conflict in the evidence. The dispute between the parties lay

---

[1]All the evidence in the record is to the contrary, and so No. 5 above will be ordered stricken. The actual fact is that the Leisure World News was and at all times has been admitted to Leisure World without any expression of assent or invitation by any resident of Leisure World whatsoever.

in their divergent views of the legal consequences of those events which all agree happened, and so the findings add nothing to aid our decisional task in terms of the customary office fulfilled by findings of fact as part of a record on appeal. In other words, the constitutional issue, as defined hereinafter, is solely one of law with reference to which the jury verdict and the court's findings have no significance whatsoever. That legal issue derives from the order *in limine* which emasculated plaintiff's deprivation of constitutional rights theory.

The plaintiff and the cross-defendants appealed from the judgment, and, in the opinion filed in our initial effort to dispose of the appeal, we held that plaintiff was entitled to an injunction by the terms of which it would be accorded access to Leisure World on the same terms and conditions as those enjoyed by the Leisure World News. We held further that plaintiff was entitled to a limited new trial on those issues of fact arising from its exclusion, solely in light of state statutes proscribing conspiracies in restraint of trade, the same considered in light of plaintiff's unconstitutional exclusion from Leisure World. Otherwise, the judgment as it reflected the jury's verdict was affirmed.

Both defendants petitioned for rehearing. We granted those petitions; the matter was reargued and submitted for decision.

While the case was under submission, counsel for Golden West informed us that the appeal against it would soon be dismissed.[2] That has occurred, and so only Golden Rain continues to oppose the appeal.

In the opinion filed following the first rehearing, we reached the same result as the first time, i.e., reversing with directions: (1) to grant plaintiff's application for equitable relief; and (2) to conduct a further trial of the Cartwright Act issues in light of the unconstitutionality of plaintiff's exclusion from Leisure World. Both sides again petitioned for

---

[2]Our information supplied by counsel was that plaintiff had sold its newspaper to Media General, a publishing company which had previously purchased the assets of Golden West. In this connection, we were further informed by counsel for plaintiff that Laguna Publishing Company had nevertheless retained ownership of its causes of action against both Golden Rain and Golden West; however, we were further advised that Laguna Publishing Company, as a condition of the sale of its newspaper to Media General, was required to negotiate a settlement with Golden West.

Thereafter, we were informed that a settlement had been reached and that the superior court had confirmed it within the contemplations of sections 877 and 877.6 of the Code of Civil Procedure. Following those proceedings, the appeal as to Golden West was dismissed October 27, 1981.

rehearing, and both petitions were again granted. Thus, the matter is once more before us for disposition.

## THE CONSTITUTIONAL ISSUE

### I

The complexity of the procedures in the trial court by which the constitutional issue was presented and resolved has necessarily resulted in prolix assignments of error relative to that issue. The plaintiff contends that the trial court's ruling of December 5, 1977, which precluded it from arguing or in any way adverting in the presence of the jury to its claim of constitutional deprivation was improper because Golden Rain's exclusion of plaintiff's newspaper from Leisure World was tantamount to state action which operated to abridge plaintiff's rights of free speech and free press. This contention proceeds upon two theories under which the exclusion from Leisure World is characterized by plaintiff as impermissible state action: (1) Leisure World is the legal equivalent of a municipality under the "company town" cases; (2) Leisure World's development and construction were accomplished only as a consequence of federally guaranteed financing, with the result that its actions partake of a public quality.

In our view, it more simply frames the issue to ask, on the undisputed extrinsic facts presented by this record, if plaintiff's free speech and free press rights, secured under either the state or federal Constitutions, were abridged by the actions of Golden Rain in excluding plaintiff's employees from Leisure World and thereby preventing the unsolicited, live carrier distribution of plaintiff's newspaper, the Laguna News-Post, to the residences in Leisure World.

### II

The trial court reserved its ruling on any right to an injunction until after the jury phase of the trial had been completed. That the trial court eventually denied plaintiff's application for an injunction, which would have forced Golden Rain to cease its exclusion of the Laguna News-Post from unsolicited, live carrier distribution within Leisure World, necessarily indicates that nothing which the trial court received in the way of evidence during the five-month, jury trial or during the additional period thereafter, during which it took evidence, operated in

its view to demonstrate any deprivation of plaintiff's constitutional rights.

This observation is confirmed by certain of the trial court's conclusions of law reached after promulgating 23 paragraphs of findings extending to over a dozen pages of the record. Such conclusions are: (a) "Plaintiff has no federal or state constitutional right to enter Leisure World of Laguna Hills to distribute its newspaper by carrier to occupants of dwelling units therein without any request or subscription therefor by such occupants"; (b) "Plaintiff has no federal or state constitutional right to enter Leisure World of Laguna Hills to distribute its newspapers by carrier to the occupants of dwelling units without any request or subscription therefor by such occupants when Golden Rain Foundation of Laguna Hills, acting within the scope of its authority, in behalf of its members, has denied Plaintiff permission to enter to make such distribution."

In our view, those conclusions are wrong insofar as the state Constitution is concerned. As a consequence, plaintiff is entitled to an injunction which will terminate its exclusion from Leisure World and thus enable it to distribute its newspaper there upon the same terms and conditions as the Leisure World News is now distributed therein,[3] subject nevertheless to such reasonable regulations as to time, place, and manner as Golden Rain may elect to adopt to regulate disposition of all newspapers within Leisure World.

## III

What then are the facts which are material to the question of whether plaintiff's free speech and free press rights were abridged when it was excluded by Golden Rain from distributing its unsolicited, giveaway newspaper to the residences of Leisure World?

Before answering that question, we are constrained to observe again, despite the evidence presented to the court in the second, nonjury phase of the trial, following which extensive findings were made, that on the

---

[3]Following the filing of our initial opinion, it would not require much imagination to suppose that Golden Rain would undertake directly or would authorize others to solicit personally each residence in Leisure World for the purpose of obtaining something in writing from each, specifically requesting delivery of the Leisure World News to that residence. If this were done, the import of this decision would require that the same opportunity to solicit each residence in Leisure World be accorded to plaintiff.

constitutional issue *this is not an evidence case.* The material, extrinsic facts are not disputed. In effect, the trial court ruled as a matter of law, without the need to resolve any issues of fact, that no constitutional deprivation had occurred as a consequence of the exclusion of plaintiff's newspaper by Golden Rain from Leisure World.[4]

From this perspective, we shall recite the undisputed facts which provide the basis for our reversal. Our factual recitation of what we see to have been significant in reaching our decision, of course, starts with the several items settled nine months before trial as being without substantial controversy, with the exception of course of No. 5 which is wholly without any evidentiary support in the record.

Supplementing the six valid items noted, the record shows that the entire residential community of Leisure World, consisting of both condominiums and cooperative housing units, is comprised of roughly contiguous groups of residents sometimes referred to as "mutuals." These mutuals are also organized as nonprofit corporations and are responsible for the actual maintenance and preservation of the residential property within their respectively defined areas. As already noted, Golden Rain owns all the *common areas* within Leisure World, including the streets and sidewalks. As a consequence, Golden Rain is responsible for the maintenance and upkeep of these non-residential areas for the benefit of all the residents of Leisure World. *All residents of Leisure World are not members of Golden Rain.* Its members must apply for and be accepted for membership, such acceptance being subject to assuming certain financial obligations.

To accomplish their respective maintenance and upkeep objectives, both the mutuals and Golden Rain early on contracted with yet another legal entity to perform the actual work functions. From 1964 to the end of 1972 the entity with such contracts was the Leisure World Foundation (hereinafter LWF), and, since 1972, Professional Community Management, Inc.

---

[4]Because the determination of the constitutional issue is and always has been an issue of law, both in the trial court and before us, we have now reached a point of aggravated impatience with counsel for Golden Rain because of their dogged advocacy on this point as illustrated by a statement in the current petition for rehearing, namely, "The legal principles coined by the Court are constructed on the Court's own independent fact searching and drawing of inferences in derogation of established rules of appellate review. As a consequence, the Court has become an advocate for plaintiff." Such intemperate and wholly inaccurate assertions are of no aid to us in the task of trying to decide a difficult case.

Although not a prescribed part of its duties under its contract with Golden Rain, LWF, from the outset of its management of Leisure World, published and delivered, *unsolicited*, to each residence therein a community-type newspaper under the banner of the Leisure World News which Golden Rain has steadfastly described as a "house organ." LWF continued to do this until it sold the Leisure World News to defendant Golden West, initially incorporated as Birchall, Smith & Weiner, Inc., by the young men, who, as employees of LWF, had performed the functions necessary to get out the paper, including the sale of advertising.

During the beginning years of its publication by LWF, the Leisure World News was a losing effort financially. Some of the costs of printing and distributing the paper were defrayed by the sale of advertising, but in the earlier years of its publication the larger share of such costs was borne as a direct expense by LWF. As time passed, this direct expense was increasingly offset by advertising revenues, but even as late as 1967 the deficit for an operation which brought in $138,390 was still $6,055, reflecting expenses of $144,445.

In 1967, the two young men who had been hired by LWF to perform the task of putting out the Leisure World News discussed with Edward Olsen, president of LWF, the possibility, while continuing to work for LWF, of their being accorded permission by their employer to publish for their own account a so-called "shopper" for distribution to persons *outside* Leisure World.

Permission to launch the new venture was granted; thereupon Carlton Smith and Richard Birchall commenced publication of the News Advertiser for circulation outside Leisure World. Smith and Birchall were allowed to maintain an office for the News Advertiser in the same space provided them by LWF to enable them to perform their duties in putting out the Leisure World News. Advertising in the News Advertiser was sold to many of the same businesses as those who bought space in the Leisure World News. This advertising was sold at the same time by the same salesmen who represented the Leisure World News.

The consequence of this was that the Leisure World News defrayed and/or absorbed many of the expenses of Birchall, Smith & Weiner, Inc., the firm eventually organized to publish the "outside" publication which Smith and Birchall had been given permission by LWF to pub-

lish while they continued to work for LWF in space provided for them. Despite this increased overhead, the steadily increasing advertising revenue of the Leisure World News brought in a net for it in 1971 of $44,630 based on a gross of $318,616.

During this interval of time, i.e., from 1967 through 1971, the Leisure World News was delivered unsolicited to all residences within Leisure World by LWF with the full knowledge of and without any objection from Golden Rain. In addition, such deliveries were carried out with a tacit understanding with Golden Rain that no competing unsolicited, give-away newspaper could be distributed within Leisure World except by mail.[5]

As a consequence of the exclusive access accorded the Leisure World News by LWF, a meeting was arranged between publishers of three of the area's competing newspapers, including plaintiff, on the one side, and Edward Olsen of LWF on the other. The basic complaint voiced to Mr. Olsen was that Leisure World's management was subsidizing the News Advertiser, published by employees of LWF, while at the same time refusing to allow its competitors inside Leisure World except by mail. Olsen responded to such complaint by asserting that this policy of LWF had been adopted and was being followed to allow LWF to recoup the losses it had suffered during the earlier years in publishing the Leisure World News.[6]

---

[5]In the earlier petitions of both defendants for rehearing this statement of fact in our original opinion was challenged as unsupported by the record. Golden West argued that the jury's verdict and the court's findings are to the contrary, explicitly pointing out that the trial court found there was no conspiracy. That argument begs the question, for such finding is based on the previous legal determination of the court that no constitutional deprivation was involved in the exclusion of plaintiff's newspaper. In any case, the facts recited above do *not* necessarily describe a conspiracy.

[6]At the initial oral argument, Mr. Watson, appearing for Golden West, referred us to pages 31-35 of Golden West's petition for rehearing as demonstrating by citations to the record a refutation that Mr. Olsen had stated that the reason for the policy which excluded all give-away newspapers except the Leisure World News was to enable LWF to recoup the losses it had suffered in earlier years. We have with exacting particularity gone through the record cited by Mr. Watson, and otherwise, and can find nothing which *directly* contradicts the testimony of Mr. Moses at reporter's transcript volume XXIII, p. 5772, lines 9-14. Just because Mr. Olsen testified that he did not recall what was said 10 years earlier does not disprove the Moses testimony. Moreover, we must again point out that arguments about substantial evidence on this point are meaningless because the court had ruled *in limine* that no constitutional right had been abridged by excluding plaintiff's newspaper. Accordingly, the necessary starting point in any analysis of the constitutional issue is a hypothesis which must ignore any findings of fact as meaningless to this issue.

Beginning in 1972 there was a series of letters and other communications between Birchall, Smith & Weiner, Inc., on the one hand, and LWF on the other, the latter being represented by Edward Olsen, the president, and Otto Musch, an accountant. No good purpose would be served here to summarize all of the steps and the numerous communications utilized to develop a "record" in the corporate minutes of the two entities. It is enough to state that the end result was that Birchall, Smith & Weiner, Inc., purchased from LWF the Leisure World News for $48,000. This price was agreed to be paid at $1,000 per month for only so long as the buyer elected to continue with publication of the newspaper, or until the 48 monthly payments had been made.

Referring again to the net of $44,630 earned by the Leisure World News in calendar 1971, which accrued even though the Leisure World News was absorbing certain of the expenses of the newspaper published by Birchall, Smith & Weiner, Inc., the record reflects, out of the mouth of the president of LWF, that LWF realized and was well aware that *if* the Leisure World News could *not* be distributed inside Leisure World on an unsolicited basis it would cease to be profitable. More particularly, Edward Olsen testified concerning the agreement to sell the Leisure World News to Birchall, Smith & Weiner, Inc., "that if the Leisure World News could not be distributed inside Leisure World on a permissive basis, that Leisure World News would have no value . . . ."

Otherwise, by the end of 1972 during which the gross of Birchall, Smith & Weiner, Inc., had grown to $559,112, Olsen and Musch had organized another corporation and had entered into contracts with the various mutuals and with Golden Rain to take over all the management functions performed up to that time by LWF for the residents of Leisure World. This new corporation as earlier noted is known as the Professional Community Management Corporation.

During this same time the pressure continued to mount from other publishers, including the plaintiff, to gain access to Leisure World for unsolicited carrier delivery. It is a reasonable inference to be drawn from the extrinsic facts that in response to that pressure, under date of March 30, 1973, a written agreement was entered into between Golden Rain and Birchall, Smith & Weiner, Inc. (by then owned 51 percent by the same persons who owned an interest in the management company servicing Leisure World),[7] which provided that Golden West would de-

---

[7] As a consequence of other litigation, the stock in Birchall, Smith & Weiner, Inc., acquired by Olsen and Musch was later restored to Smith and Birchall.

liver the Leisure World News to all of the residents of Leisure World. This arrangement covered over 10,000 copies per week at an annual rate of $3,600. As a consequence, the unsolicited carrier delivery of the Leisure World News to all residences of Leisure World continued just as before. However, a representation was then made to the competition, including plaintiff, that the Leisure World News was being delivered in compliance with the rules and regulations of Golden Rain which required that newspapers could only be delivered by carrier within Leisure World to *subscribers*. Nevertheless, the record fails to disclose that any resident of Leisure World ever sought execution of the agreement or even knew of its existence.

More particularly, as stated in plaintiff's opening brief, "[t]he Defendants never asked permission of the residents to allow BIRCHALL, SMITH & WEINER, INC. to distribute and the record is completely void of any evidence which showed that [even] one resident of LEISURE WORLD OF LAGUNA HILLS ever requested that the LEISURE WORLD NEWS be delivered to them over the period of 1965 through the time of trial."

Otherwise, on the record, it is doubtful whether the board of directors of Golden Rain had authority to enter into the agreement providing for unsolicited delivery of the Leisure World News to *all* the residents of Leisure World.

We have already related that the board of directors of Golden Rain on March 30, 1973, entered into a written agreement with the predecessor of Golden West by means of which Golden Rain undertook on behalf of all the residents of Leisure World to "subscribe" to the Leisure World News for each of those residents.[8]

In our original opinion, we characterized this agreement as a "cosmetic subterfuge," and we remain persuaded that this is an accurate characterization of the agreement. To be more explicit in disclosing our reasons for this view of the matter, we note that the record includes copies of both the articles of incorporation and bylaws of Golden Rain.

---

[8]There appears to be a disparity of viewpoint between the two defendants as to the import of this agreement. Golden Rain in its earlier petition for rehearing states, "Nothing in the agreement designates the residents of Leisure World as 'subscribers.'" On the other hand, Golden West in its petition for rehearing quotes at length the testimony of George Bouchard of Golden Rain to the effect that it was the intent of the agreement to make the residents of Leisure World "subscribers" to the Leisure World News. Otherwise, in the body of Golden West's petition for rehearing references are made repeatedly to the "subscription agreement."

These items are significant not only in what they show but in what they do not show. Nowhere in either instrument is there delegated to the board of directors of Golden Rain any authority to decide what persons or publications shall be afforded *uninvited* entry into Leisure World for purpose of delivery to the individual residences of Leisure World. Actually the subject is not dealt with at all.

In addition, the bylaws of Golden Rain, exhibit "J," provide, in article II, for two classes of membership in the corporation as well as for qualification and admission to membership. *Membership is not automatic.* A resident must apply for membership in a mutual and at the same time for membership in Golden Rain. The pertinent provision states, "When a subscriber has been admitted to membership in a Mutual and has paid an initiation fee as fixed and determined by the board of directors, he shall be admitted to resident membership in the corporation, which membership shall be appurtenant to his membership in the Mutual."

In going through exhibit "I," the articles of incorporation, we noted that attached to the original draft were certain amendments. Of interest here is the fact that each amendment carried a recitation of the number of members entitled to cast votes for the amendment. The latest amendment constituting a part of this exhibit was dated February 8, 1971, at which time 7,379 members were entitled to vote and did consent to the amendment. According to the record otherwise there were at the time of the events here material to this litigation some 20,000 residents of Leisure World scattered through 12,000 residences. From this it appears that a substantial number of residents of Leisure World were *not* members of Golden Rain during the period here involved.

The consequence of all this, of course, is that Golden Rain purported to "subscribe" to the Leisure World News on behalf of a large number of residents who not only had *not* delegated any such authority to Golden Rain in its articles and bylaws, *but who in fact were not even members of Golden Rain.* In short, what Golden Rain undertook to do by means of the March 30, 1973, agreement was presumptuous, if not brazen, and therefore can fairly be described as a "cosmetic subterfuge."

In any event, in May of 1973, the plaintiff's general manager sent a letter to the presidents of each of the mutuals in Leisure World as follows: "Last November the News-Post submitted a request to the

management of Leisure World to be allowed permission to distribute the News-Post by carrier in Leisure World. We were promised that each mutual board would be consulted at their December meetings and we would have an answer within a month. [¶] After a luncheon with Robert Price and several telephone inquiries, we were told late in March that our request was denied. Further inquiries have indicated that directors of the various mutuals have never been made aware of our request. [¶] We feel the management of Leisure World would prefer not to have an independent local newspaper distributed in Leisure World. Therefore they have made it as difficult as possible for us to distribute our newspaper, and we must go to the considerable expense of mailing to our readers. [¶] The News-Post has published news stories that the management would prefer not to come to the attention of the residents. However, we do not feel the residents of Leisure World want someone else to determine what they might read. It is unfair and discriminatory to deny to one newspaper a privilege that is granted to another, even if the other newspaper can be controlled. [¶] We request that your mutual board take our request under consideration. I would be glad to appear before your board to answer any questions your directors might have. We believe their judgments are more representative of your residents and less influenced by the pressures of management. [¶] I will be anxious for your reply by mail or phone. All we want is a fair shake."

In reply thereto the then president of Golden Rain wrote some four months later, "[u]nder date of May 11, 1973, you sent a letter to the Presidents of all Mutual Corporations within the community of Leisure World, Laguna Hills. Since the subject matter of your letter relates to the community as a whole, all recipients of your letter are replying [by] this letter. [¶] Please be advised that existing regulations have been, since inception of Leisure World and remain so at the present time, that delivery of newspapers within the community can be made by your company, providing you abide by the community's rules, which presently include the privilege extended to your newspaper to have carriers deliver copies to each and all of your subscribers. [¶] You are therefore permitted to deliver newspapers within Leisure World so long as you abide by the above regulation."

The letter was also signed by the presidents of 11 of the mutuals. The position of Golden West and Golden Rain, maintained from the time of the agreement between Golden Rain and Birchall, Smith & Weiner, Inc., was that carrier delivery of the Leisure World News to every resi-

dence in Leisure World was permitted by Golden Rain because each such residence was regarded as a paid "subscriber" thereto by reason of the March 30, 1973, agreement noted earlier.[9] In this connection, we point out again that Golden Rain had neither legal nor ostensible authority to act for any resident who was not a member, and it is clear from the record that not every resident of Leisure World was a member of Golden Rain.

Otherwise, we are constrained to observe that there was a period of at least six years, i.e., from 1967 to 1973, during which there was no "subscription" agreement and during which the Leisure World News enjoyed a live carrier, exclusive access for give-away type newspapers within Leisure World to the exclusion of the Laguna News-Post and other similar publications. This circumstance was instituted and enforced by LWF, the publisher of the Leisure World News, while LWF had a management contract with Golden Rain which apparently well knew what was going on and suffered it to continue. On this point, we note once more that defendants argue that the arrangement with LWF was only an innocuous policy of Golden Rain to provide for a "house organ." In light of such argument, we find it significant that it was Edward Olsen himself, president of LWF, and not someone from Golden Rain with whom a representative of plaintiff met in an effort to break the exclusion. Moreover, it was Olsen who stated that the exclusive access allowed the Leisure World News was a policy explicitly adopted by LWF to recoup its earlier losses sustained in publishing the Leisure World News. In this connection, while Golden Rain may have owned the streets and sidewalks within Leisure World, it was LWF which employed the security personnel which enforced the exclusion it had instituted with no exception thereto taken by Golden Rain.

Nevertheless, soon after the letter last quoted above was received, this litigation was begun.

Referring to Golden Rain's current petition for rehearing, we note that a vigorous argument is again made that the Leisure World News is a "house organ" quite different in its content and purpose from those give-away type newspapers, including plaintiff's, which have been excluded. While this may be true in a sense, it conveniently overlooks the compelling feature of the Leisure World News and of those excluded

---

[9]See footnote 8 where we referred to the testimony of George Bouchard to this effect.

which is the same, namely their advertising content. More exactly, we are not here concerned with why the Leisure World News was *admitted* to Leisure World, i.e., even if as a "house organ," but why plaintiff's newspaper was *excluded*.

Whether the Leisure World News is or is not a "house organ" has no significance as a fact for consideration in reaching our decision. On the contrary, it was the *similarities* of the Leisure World News and plaintiff's newspaper which were what spawned this litigation and necessarily provide the basis for its resolution. In other words, what is significant is that the Leisure World News carries advertising and that it is the only give-away type newspaper carrying advertising which reaches the huge audience comprised of the residents of Leisure World. It is a competitor for the advertising dollar which retailers spend in this area of Orange County, and the fact that it has a captive audience of 20,000 affluent people whom advertisers are trying to reach is an overriding factor which no amount of sophistry emphasizing that the Leisure World News is a "house organ" can evade. The consequences of this fact are both dramatic and decisive in guiding our approach to a decision in this case. To resort to the overworked cliche, "the bottom line," here it is $1,873,204, which represents the gross revenues of the publishers of the Leisure World News who started with an initial investment of $1,000 and in just 10 years built their business to one with the almost $2 million gross noted. No doubt good management played an important part in this success story, but *exclusive access* of the advertising in the Leisure World News to the residents of Leisure World must be regarded as having played a decisive part in this success, even by the most begrudging advocate. In a word, the plaintiff's newspaper and the Leisure World News are *identical* insofar as they play their roles in competing for the local advertising dollar. Moreover, it was plaintiff's exclusion from the opportunity to compete for these advertising revenues which raised this dispute, and, parenthetically, it was this theory which plaintiff was precluded from presenting to the jury in its constitutional proportions.

To summarize, then, it emerges clearly from the foregoing synopsis that in the first instance, i.e., from 1964 up to May 1, 1972, after which the management company, LWF, sold the Leisure World News to defendant Golden West (then Birchall, Smith & Weiner, Inc.), that LWF, with the tacit concurrence of Golden Rain, distributed the Leisure World News to all residences within Leisure World by live carrier ·on *an unsolicited basis.* Beginning in 1967, the same year in which Bir-

chall et al., started up their "shopper," LWF, with the tacit concurrence of Golden Rain, excluded from Leisure World all other give-away type newspapers, including plaintiff's, except those to which the residents of Leisure World had subscribed.

From May 1, 1972, to March 30, 1973, during a time when the president of the management company was also a shareholder in defendant Golden West, the same arrangement continued, and the Leisure World News was accorded exclusive live carrier circulation privileges within Leisure World to the exclusion of plaintiff's newspaper. On the latter date, an agreement was entered into which purported, at least in the view of George Bouchard, a member of the Board of Directors of Golden Rain, to make all the residents of Leisure World "subscribers" to the Leisure World News and thus to place it arguably within the same category as other newspapers delivered within Leisure World on a subscription basis. This position was taken notwithstanding that all residents of Leisure World were not then members of Golden Rain.

The facts are clear. Plaintiff was purposefully excluded from Leisure World, and this operated to foreclose plaintiff's opportunity to communicate its advertising to the residents of Leisure World, notwithstanding that the Leisure World News, a similar publication, in that it carried advertising, was afforded that opportunity. This alignment of competitive factors must be viewed in light of the fact that Golden West within 10 years after its predecessors became operative with a $1,000 investment was able to generate gross advertising revenue of $1,873,204. (1) Whether or not the curtailment of plaintiff's opportunity to communicate with the residents of Leisure World under these precisely defined circumstances and thereby to be denied an equal chance to compete for those revenues was an abridgement of its constitutional rights of free speech and free press is the threshold question which we must address.

## IV

Before proceeding with efforts to answer this question, we hasten to note that such efforts have been undertaken with a full awareness that any *constitutional* issue necessarily arises in the arena of a contest between the citizen and his government. Thus, the basic issue in many cases involving a claimed deprivation of constitutional rights is whether or not so-called state action is present. So it is here, and historically, the free speech, private property cases have fallen generally into two

groups. The first group is comprised of the company town cases descending from *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276], which involved an individual who was arrested for attempting to sell religious publications on the streets of a privately owned company town, Chickasaw, Alabama. In the litigation which was finally resolved in the Supreme Court of the United States, it was determined that the action of the company in excluding private individuals from exercising their free speech rights on the streets of the company town was unconstitutional.

Without going into an extensive recitation of the rationale of the decision, it is enough for our purposes here to observe that the high court looked upon the company town as tantamount to a municipality. This imputation imported the concept of state action of a kind proscribed under the Fourteenth Amendment, for the exercise of free speech cannot be limited by a true municipality. On this latter proposition, reference is made to *Van Nuys Pub. Co.* v. *City of Thousand Oaks* (1971) 5 Cal.3d 817 [97 Cal.Rptr. 777, 489 P.2d 809], which struck down a city ordinance which prohibited unsolicited delivery to private residences of precisely the same kind of newspaper as published by plaintiff.

Plaintiff relies heavily on certain language in *Marsh* in arguing that its exclusion from Leisure World amounted to state action, entitling it not only to injunctive relief but affording it a further claim for damages arising under 42 United States Code section 1983. However, even though resourceful in its arguments by analogy, plaintiff has not persuaded us that Leisure World is a company town for purposes of resolving the free speech, discrimination issue. There are no retail businesses or commercial service establishments in Leisure World. It is solely a concentration of private residences, together with supporting recreational facilities, from which the public is rigidly barred. However, the peculiar attributes of Leisure World which in many ways approximate a municipality bring it conceptually close to characterization as a company town, and such attributes do weigh in our decision as will be later discussed.

The other line of free speech, private property cases is that involving regional shopping centers, which, for our purposes, starts with *Diamond* v. *Bland* [*I*] (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733], followed by *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219], which led to *Diamond* v. *Bland* [*II*] (1974) 11 Cal.3d

331 [113 Cal.Rptr. 468, 521 P.2d 460]. In the *Diamond* cases, which were an outgrowth of an exclusion from a San Bernardino regional shopping center of solicitors of signatures for an antipollution initiative, the court ultimately held, because the plaintiffs had effective, alternative channels of communication with the public, and because the solicitation activities bore no relationship to the shopping center activities, that it was permissible to exclude the plaintiffs. The court said, "[u]nder these circumstances, we must conclude that defendants' private property interests outweigh plaintiffs' own interests in exercising First Amendment rights in the manner sought herein." (*Diamond* v. *Bland* [*II*], *supra*, 11 Cal.3d 331, 335.)

However, that is not the last word on the subject. More recently, the California Supreme Court, acting expressly under the California Constitution, reversed its position on the regional shopping center, doing so in *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341]. In *Pruneyard,* on facts strikingly similar to those in *Diamond,* the court ruled that the exercise of free speech rights unrelated to the customary commercial activities conducted within a privately owned, regional shopping center cannot be prohibited by the shopping center, provided the free speech activity does not interfere with or impinge in any way upon such customary commercial activity.

The *Pruneyard* case was appealed to the United States Supreme Court, which, recently, handed down its opinion. (*Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035].) The United States Supreme Court decided that our state Constitution *could* provide more expansive rights of free speech than that provided by the federal Constitution, and that the state Constitution in affording these expanded free speech rights, as announced in *Pruneyard,* does *not* import a violation of the shopping center owner's or tenants' property rights under the Fifth or Fourteenth Amendments to the United States Constitution.

Because the public is not invited but excluded from Leisure World, and because we read *Diamond* [*I*] and *Pruneyard* to reach the results they do primarily because of this feature of unlimited public access, notwithstanding the stated basis for the decision of the United States Supreme Court in *Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551, we have concluded, while such cases are of no direct assistance, that they do define certain concepts for us to build on in reaching our decision here.

*Pruneyard* is an intriguing decision. Our Supreme Court decided that plaintiffs' free speech rights as guaranteed by the state Constitution had been abridged when they were excluded from a regional shopping center, and it did so without ever once discussing or even impliedly dealing with the phenomenon of *state action* except in its discussion of *Lloyd*.

Proceeding from this perception of *Pruneyard's* content, it could be argued that the decision, by implication, stands for the proposition, in California, that a *private individual* can be held to have violated the state constitutional rights of another, at least the latter's free speech rights. However, we do not choose to interpret *Pruneyard* that broadly, leaving it to the Supreme Court itself to do so if *Pruneyard* actually was intended to extend the notions of state constitutional law into such an unexplored salient.

It is enough to conclude here that *Pruneyard*, by reason of its emphasis on the unrestricted access to the shopping center accorded the public, held that the limitations upon plaintiff's free speech rights were impermissibly proscribed under a rationale closely approximating that developed in *Marsh*. In other words, because the public had been *invited* on to private property, they would be deemed as remaining clothed with their free speech rights secured under the state Constitution for so long as the exercise of those rights did not impinge on the property rights of the merchants doing business in the shopping center, all with the result that any attempted curtailment of those rights imported the implicit sanction of state action.

Otherwise, to emphasize the dignity of the right of free speech under the California Constitution, *Pruneyard* drew upon language from *Agricultural Labor Relations Bd.* v. *Superior Court* (*ALRB*) (1976) 16 Cal.3d 392 [128 Cal.Rptr. 183, 546 P.2d 687], that "all private property is held subject to the power of the government to regulate its use for the public welfare." (*Id.* at p. 403.)

This *ALRB* case was further invoked to announce, "'We do not minimize the importance of the constitutional guarantees attaching to private ownership of property; but as long as 50 years ago it was already "'thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination of the rights of society. Although one owns property, he may not do with it as he pleases any more than he may act in accordance with his personal desires. As the interest of society justifies restraints upon

individual conduct, so, also, does it justify restraints upon the use to which property may be devoted. It was not intended by these constitutional provisions to so far protect the individual in the use of his property as to enable him to use it to the detriment of society. By thus protecting individual rights, society did not part with the power to protect itself or to promote its general well-being. Where the interest of the individual conflicts with the interest of society, such individual interest is subordinated to the general welfare.'"' (*Agricultural Labor Relations Bd.* v. *Superior Court, supra*, 16 Cal.3d at p. 403, ...)" (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d 899, 906.)

*Pruneyard*, in further reliance on the *ALRB* case, observes "that the power to regulate property is not static; rather it is capable of expansion to meet new conditions of modern life. Property rights must be '"redefined in response to a swelling demand that ownership be responsible and responsive to the needs of the social whole. Property rights cannot be used as a shibboleth to cloak conduct which adversely affects the health, the safety, the morals, or the welfare of others.'" (16 Cal.3d at p. 404, quoting Powell, *The Relationship Between Property Rights and Civil Rights, supra*, 15 Hastings L.J. at pp. 149-150.)" (*Id.* at pp. 906-907.)

To this we add that the gated and walled community is a new phenomenon on the social scene, and, in the spirit of the foregoing pronouncement, the ingenuity of the law will not be deterred in redressing grievances which arise, as here, from a needless and exaggerated insistence upon private property rights incident to such communities where such insistence is irrelevant in preventing any meaningful encroachment upon private property rights and results in a pointless discrimination which causes serious financial detriment to another.

This observation suggests that the facts of the case before us include two additional ingredients not found in the *Pruneyard* mix. While the public is not invited into Leisure World, Leisure World in many respects does display many of the attributes of a municipality. That is to say, although the public generally is not invited, there is substantial traffic into Leisure World of a variety of vendors and service persons whom the residents of Leisure World do invite in daily to accommodate the living needs of a community this large. By this we mean to refer to

plumbers, electricians, refrigeration repairmen, painters, United Parcel deliverymen, to name a few, plus the carriers of newspapers to which the residents have subscribed.

The other ingredient noted is the exclusion of plaintiff while the Leisure World News has been accorded unrestricted entry by Golden Rain even though no individual resident has invited in the Leisure World News. Suppose Golden Rain had undertaken to impose on the residents of Leisure World a rule that only one particular plumber would be allowed to enter Leisure World to perform this kind of service. If such an effort were made by Golden Rain, the discrimination would be apparent to anyone, not to mention its limitation on the residents' freedom of choice.

Thus, the question arises as to whether the factor of discrimination is significant. To answer this question, there is a line of constitutional cases involving *discrimination* which does open the door to decision here. Just as we have interpreted *Pruneyard*, these cases do find "state action" present in an analogous way as an element affecting decision where there is actual or even threatened enforcement by state law in aid of *discriminatory* conduct. That concept is central, for instance, to the decisions in the so-called lunch-counter cases. Equally important to our analysis here there is a suggestion in *Lloyd* itself that such concept would even apply in federal First Amendment cases. And why not? Surely the First Amendment shares equal dignity with the Fourteenth.

Turning then in this context to *Lloyd Corp.* v. *Tanner, supra*, 407 U.S. 551, that case was a so-called shopping center case in which the respondents undertook to distribute handbills in the interior mall area of petitioner's large, privately owned, regional shopping center. Just as in *Pruneyard*, private security guards invited the respondents to repair to the adjoining public streets to distribute their literature. Respondents did so and then sought an injunction against their exclusion, claiming a violation of their First Amendment rights. The Supreme Court of the United States reversed the judgment which granted respondents the injunction they sought and, in so doing, held that there had been no dedication of petitioner's privately owned and operated shopping center to public use so as to entitle respondents to exercise any First Amendment rights therein unrelated to the shopping center's operations. The case further held that petitioner's property did not lose its private character and its right to protection under the Fourteenth Amendment

merely because the public had generally been invited to come into the premises for the purpose of doing business with petitioner's tenants.

As already noted, this led to the California Supreme Court's decision in *Diamond* [*II*], which in turn was reversed on *state* constitutional grounds by *Pruneyard.*

However, of significance to the issue here is certain language in *Lloyd* which suggested that a different result might have been reached had there been a different scenario. In the latter portion of the decision, the United States Supreme Court said, "The basic issue in this case is whether respondents, in the exercise of asserted First Amendment rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against all handbilling. In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on state action, not on action by the owner[s] of private property used *nondiscriminatorily* for private purposes only." (*Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551, 567 [33 L.Ed.2d 131, 142]; original italics deleted, our italics added.)

The key word is "nondiscriminatorily." As an indication that this notion was not suggested by an inadvertent choice of words, the opinion soon thereafter states, "'The United States Constitution does not forbid a State to control the use of its own property for its own lawful *nondiscriminatory* purpose.'" (*Id.* at p. 568 [33 L.Ed.2d at p. 142]; italics added; quoting from *Adderley* v. *Florida* (1966) 385 U.S. 39, 48 [17 L.Ed.2d 149, 156, 87 S.Ct. 242].) From this language we deduce, if the court had been faced with a *discriminatory* limitation of free speech on private property, that it may well have reached a different result.

Returning to California cases, our analysis brings us to *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825]. That celebrated case struck down as unconstitutional Proposition 14 which appeared on the statewide ballot in 1964. That measure, adopted by popular vote, sought to restrict the power of the state to legislate against the right of any person, desiring to sell, lease or rent his real property, "to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses." (Former Cal. Const., art. I, § 26.)

This proposition was a direct reaction to the Hawkins Act and the subsequent Rumford Fair Housing Act which were aimed at eliminating racial discrimination in housing. The legal effect of Proposition 14 was to nullify these legislative efforts as they applied to discrimination in the housing market of California. The California Supreme Court in *Mulkey* exhaustively marshaled the authorities to demonstrate the presence of state action in the operation of Proposition 14 so as to bring it within the equal protection clause of the Fourteenth Amendment. Relying in the first instance on *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441], the court in *Mulkey* said, "*Shelley*, and the cases which follow it, stand for the proposition that when one who seeks to discriminate solicits and obtains the aid of the court in the accomplishment of that discrimination, significant state action, within the proscription of the equal protection clause, is involved." (*Mulkey* v. *Reitman, supra*, 64 Cal.2d 529, 538.)

*Mulkey* went on to observe, "It must be recognized that the application of *Shelley* is not limited to state involvement only through court proceedings. In the broader sense the prohibition extends to any racially discriminatory act accomplished through the significant aid of any state agency, even where the actor is a private citizen motivated by purely personal interests. [Citing *Burton* v. *Wilmington Pkg. Auth.* (1961) 365 U.S. 715, 722 (6 L.Ed.2d 45, 50-51, 81 S.Ct. 856).]" (*Id.* at p. 538.)

Other cases relied upon in *Mulkey* demonstrate the nature and extent of just what it meant by significant state involvement so as to bring essentially private conduct dependent on state implementation within the ambit of proscriptions on unconstitutional state action included: *Evans* v. *Newton* (1966) 382 U.S. 296 [15 L.Ed.2d 373, 86 S.Ct. 486]; *Terry* v. *Adams* (1953) 345 U.S. 461 [97 L.Ed. 1152, 73 S.Ct. 809]; *Robinson* v. *Florida* (1964) 378 U.S. 153 [12 L.Ed.2d 771, 84 S.Ct. 1693]; and *Anderson* v. *Martin* (1964) 375 U.S. 399 [11 L.Ed.2d 430, 84 S.Ct. 454].

The end result in *Mulkey* was to declare unconstitutional Proposition 14 because it operated to deny the plaintiffs equal protection of the laws in a case where the trial court had awarded a summary judgment against them in an action seeking relief under sections 51 and 52 of the Civil Code as those sections then read.

When *Mulkey* and the alternative scenario in *Lloyd* are viewed along with the "state action" implications of *Pruneyard*, the outline of a work-

able rule emerges for application to the facts of the case before us. Its rationale derives from the differential view of "state action" as characterized in the *discrimination* cases when compared to that in other constitutional cases. In this case, while Leisure World is not a "company town" so as to require that it yield to the results reached in *Marsh*, it is a hybrid in this sense.[10] The question then becomes, notwithstanding that the public is generally excluded except upon invitation of the residents, whether its town-like characteristics compel Golden Rain's yielding to certain constitutional guarantees as a consequence of its adding discrimination to the picture. When that element is added, the balance tips to the side of the scale which imports the presence of state action per *Mulkey* and the lunch counter cases. In other words, Golden Rain, in the proper exercise of its private property rights, may certainly choose to exclude *all* give-away, unsolicited newspapers from Leisure World, but once it chooses to admit one, where that decision is not made in concert with the residents, then the discriminatory exclusion of another such newspaper represents an abridgement of the free speech, free press rights of the excluded newspaper secured under our state Constitution.

In the current petition for rehearing Golden Rain devotes considerable ink in support of its contention that there could have been no discrimination practiced against plaintiff's newspaper because "Discrimination presupposes meaningful similarity." We are indebted to counsel for Golden Rain for supplying us the concise terms we have labored to locate. "Meaningful similarity," that's it! On the undisputed facts before us there could be no more meaningful similarity possible than emerges in the comparison of the Leisure World News and plaintiff's newspaper. That *meaningful similarity* lies in their common role as competitors for the advertising dollars to be spent in this marketing area, an area where the Leisure World News has exclusive access to the residents of Leisure World and from where plaintiff was barred from making the unsolicited deliveries available to the Leisure World News. Thus, the legal conclusion that there was unconstitutional discrimination practiced against plaintiff's newspaper is inescapable.

Based upon the foregoing, keeping in view the greater status of the rights of free speech and free press existing under the California Consti-

---

[10]Leisure World at the time material to this litigation had about 20,000 residents, its own system of roads and streets, its own security force, its own parks, its own recreation facilities, and a hybrid form of self-government which dealt with matters of internal maintenance, security, and operation of the 8 square miles of the project.

tution as delineated in *Pruneyard*, and keeping in mind also that discriminatory proscription of free speech on private property may even be questionable under the federal Constitution, as suggested by *Lloyd*, we hold that Golden Rain, acting with the implicit sanction of the state's police power behind it, impermissibly discriminated against the free speech and free press rights of plaintiff, guaranteed to it under the state Constitution, by excluding it from Leisure World after it, Golden Rain, without authority from the residents of Leisure World, had chosen to permit the unsolicited delivery of the Leisure World News to the residents of Leisure World. As a consequence, for so long as Golden Rain permits the unsolicited[11] delivery of the Leisure World News to the residents of Leisure World, then it cannot permissibly discriminate against plaintiff's opportunity to communicate with the residents of Leisure World by excluding unsolicited delivery of its newspaper to these same residents.

V

Defendant Golden Rain has argued that to subject the residents of Leisure World to unsolicited delivery of plaintiff's newspaper would frustrate their investment expectations of privacy and freedom from the intrusions of those who have not been invited, citing *Kaiser Aetna* v. *United States* (1979) 444 U.S. 164 [62 L.Ed.2d 332, 100 S.Ct. 383]. Without more we would agree with such contention; however, *it was the management of Leisure World itself which let down the bars, and Golden Rain which suffered the discrimination to continue.* It was thus the choice of Golden Rain which resulted in the threat of any claimed encroachment on the privacy of the residents of Leisure World. In this vein, it is pertinent to observe, if the residents of Leisure World do not want *unsolicited*, give-away newspapers delivered to their homes by live carrier, then Golden Rain should cease its discrimination and exclude them all, including the Leisure World News.

Actually, as a practical matter, in response to the turgid rhetoric about the imposition on privacy and property rights which admission of plaintiff's newspaper to Leisure World would supposedly represent, it is fair to say that there would be no imposition of substance. Parentheti-

---

[11]Again, we observe that a substantial number of the residents of Leisure World are not even members of Golden Rain, and so the steps taken by which Golden Rain purported to "subscribe" to the Leisure World News for all such residents were meaningless in terms of the issue here presented.

cally, what we see happening is plaintiff's delivery personnel being screened in the same way that the carriers of the Los Angeles Times are screened; we see plaintiff's delivery personnel being instructed that they are permitted to move about the streets of Leisure World during certain daylight hours on certain days; we see plaintiff's delivery personnel placing copies of the Laguna News-Post on the front steps or porch of each residence of Leisure World in much the same manner as would a United States Postal Service employee deliver the newspaper if it were mailed in. This hardly represents an assault upon the privacy of any resident of Leisure World beyond what is already occurring, *especially when no resident of Leisure World has actually requested delivery of the Leisure World News either.*

Nevertheless, if this activity represents an unacceptable intrusion upon the privacy of the residents of Leisure World, a privacy which it is argued they paid for when they bought homes there, then Golden Rain should cease its discrimination and exclude *all* newspapers to which individual residents have not *personally* subscribed.

The rule we announce as the basis for resolution of this phase of the case will not result in requiring unrestricted admittance to Leisure World of religious evangelists, political campaigners, assorted salespeople, signature solicitors, or any other uninvited persons of the like. It will compel admission only of those who wish to deliver a newspaper like the Leisure World News, "like" in the sense that it is a competitor of Leisure World News for the same advertising dollars to be spent by businesses in Southern Orange County. In short, for purposes of avoiding discrimination against the state constitutional guarantees of free speech and free press, the right of any and all to enter this private, gated community to exercise this state constitutional right must be exactly measured by the right accorded to one, both as to the nature of the activity of that one as well as to the conditions of his admission. Under such a rule, the owners of this private property still remain in *complete* control of who shall enter Leisure World, while Golden Rain is yet required only to act fairly and without discrimination toward others in the exercise of their state constitutional rights of free speech and free press which rights Golden Rain itself has chosen to accord exclusively to the Leisure World News while acting wholly beyond the knowledge and complicity of any resident of Leisure World.

## VI

In one of the earlier petitions a worried concern was voiced that the rule here announced would confer a kind of "equal time" entitlement on any who wished to enter should persons of opposite or different views have been "invited" into Leisure World to speak or to entertain. To note these objections to the rule is itself enough to demonstrate how wide they are of the mark. The rule we have announced has nothing to do with instances where persons are *invited* into Leisure World *by its residents.* The premise on which the rule here announced has derived is the discrimination by Golden Rain which has allowed an exclusive opportunity to Golden West to deliver its Leisure World News to the residents of Leisure World *where, as to those residents individually, such deliveries are wholly unsolicited.* To this extent, Golden Rain, with absolutely no advice from or consultation with the actual residents, by its own choice and not that of the residents, has rendered Leisure World an area where a singular member of the public is admitted for this limited purpose. Thus, the rule has absolutely no application to any person who or activity which the *residents* of Leisure World may choose to invite to come in.

The principal argument advanced by *Golden Rain* in its earlier petition for rehearing which challenged our initial decision was also that it contravened constitutionally guaranteed rights to privacy and freedom of association. No good purpose would be served here to respond specifically to each of the points contained in the 10 pages of learned constitutional discourse offered under point IV of Golden Rain's earlier petition for rehearing except to say that we can only agree with the propositions there recited. The problem with the petition is that it ignores the realities of this case.

We have already noted the letter directed to plaintiff by the president of Golden Rain which closed with the statement that "you are therefore permitted to deliver newspapers within Leisure World so long as you abide by the above regulation" which meant that plaintiff could enter Leisure World and deliver its newspaper to any of its "subscribers." Of course, we all know that in the nature of things there are no "subscribers" to give-away newspapers which subsist entirely by advertising. However, the point remains that Golden Rain specifically indicated that it had no objection to associating with plaintiff's carriers provided those carriers were inside the gates of Leisure World solely to deliver plaintiff's newspaper to its "subscribers." Just how these very same carriers

would ipso facto become a threat to the freedom of association and right of privacy within Leisure World just because they would be delivering plaintiff's newspaper on an unsolicited instead of a subscription basis escapes us.

Similarly, much is made of the fact that residents of Leisure World actually performed the distribution of the Leisure World News, the implication being that some infectious, undisciplined rabble would overrun Leisure World if plaintiff were allowed to distribute its newspaper there.[12]

If this is truly a concern, we see no legal problem in Golden Rain's imposing a regulation which would require employment of only Leisure World residents for delivery of *any* unsolicited publication. This would fall well within the ambit of Justice Traynor's time, place, and manner rule in *Hoffman*.[13] Otherwise, Golden Rain could prescribe that any resident who elected not to receive the unsolicited delivery would need only notify Golden Rain of such wishes and that would terminate delivery at that residence.

The significant point is that we see nothing in the record which indicates that the individual residents of Leisure World have expressed themselves on what give-away newspaper is to be allowed to enter and what ones are to be excluded. The discriminatory exclusion has been imposed solely by the owner of the common areas, i.e., the owner of the streets and sidewalks, not the owners of actual residences. Thus, we are forced to conclude that the real reason for the exclusion of the plaintiff's newspaper had and continues to have little if anything to do with an actual concern for the preferences of the residents as to whom they shall associate with. In short, at the time this litigation began and continuing to the present, the distribution to the residents of Leisure World of the Leisure World News was and is just as much *unsolicited* by them as was and is that of the Laguna News-Post.[14]

---

[12]Here it is again appropriate to refer to Golden Rain's letter to plaintiff advising that it was free to enter to deliver its newspaper to subscribers. With this the case, we fail to see the relevance of the strident pleas about rights to privacy and to freedom of association.

[13]*In re Hoffman* (1967) 67 Cal.2d 845, 852-853 [64 Cal.Rptr. 97, 434 P.2d 353].

[14]Here is the appropriate place to observe that we do not regard this case as one likely to generate a great constitutional upheaval despite the stentorian tones in which Golden Rain has portentously argued it. The reason this litigation was commenced and has been so vigorously defended is money, and it has nothing to do with protecting any private rights of association. It began because of a fight between two newspapers over

## VII

Based upon the foregoing discussion of points IV, V and VI, the trial court's denial of plaintiff's application for an injunction to end its exclusion from Leisure World will be reversed.

Having determined that there is a legal basis for reversal as discussed above, there is no need to address plaintiff's other contention that state action was implicit from the fact that Leisure World was developed with federally insured financing.

### DAMAGES FOR THE CONSTITUTIONAL DEPRIVATION

#### I

■ Because we do not wish to extend this opinion beyond its already inordinate length, it is enough to observe here that we agree with the trial court and hold that plaintiff neither pleaded nor proved a right to damages under 42 United States Code section 1983. That section provides for recovery of damages against any person "who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Under our decision we have ruled that there has been no deprivation of any right, privilege or immunity secured by the Constitution and laws of the United States.

In other words, it is an answer to plaintiff's claim of right to an opportunity to prove alleged damages under 42 United States Code section 1983 to observe that the discrimination which we hold was here practiced was solely with reference to the plaintiff's free-speech, free-press rights secured under the *California Constitution.* To this, plaintiff could conceivably respond that in our decision we have noted a suggestion in *Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551, that discriminatory conduct in a First Amendment context might well have led to a different result, and that therefore we must further decide explicitly, because we have held "state action" to have been present in plaintiff's exclusion

---

advertising revenues, and just why Golden Rain has taken sides in the dispute, even to the point of practicing free press discrimination, eludes us. This is purely and simply a discrimination case with substantial economic consequences, and not one truly involving the resolution of the rights of free speech in conflict with the vested rights of private property.

from Leisure World, whether a federal constitutional right was abridged in order to afford a full and complete disposition of plaintiff's claim to damages under the federal civil rights statute. To this we say again that no *federal* right is here involved and that *Lloyd* only suggested the thread by which the knot was unraveled. Moreover, it is enough to decide, which we do, that the "state action" necessary to import the sanction of constitutional restraint dictated by the Constitution of California is not coextensive with and is something less than that degree of conduct sufficient to entitle one to a right of action for damages under 42 United States Code section 1983 where a federal right allegedly has been violated.

Just what that quantum of difference is we need not define. Because of the special dignity accorded the rights of free speech arising under the California Constitution as announced in *Pruneyard*, it is enough to state that the difference is readily recognizable here, and it is the more recognizable because of the palpably serious economic consequences which were caused by Golden Rain's discriminatory exclusion of plaintiff's newspaper from Leisure World.

## II

Although plaintiff has no claim to damages under the federal civil rights statute, because we have decided that it was constitutionally impermissible under the California Constitution for Golden Rain to exclude plaintiff's newspaper from Leisure World after it had for years allowed exclusive access to Leisure World by the Leisure World News, it remains to be decided if there is any *other* theory upon which plaintiff could be entitled to damages.

Plaintiff contends that the court compounded the error of its December 5, 1971, ruling by means of amplifying remarks made at the time it granted the defense motion above noted in which remarks it stated that there was no right to money damages in any event because the state constitutional right, if there were one, is not "self-executing."

It is clear from the record that the trial court at the time of the ruling of December 5, 1977, was of the view, based solely on the pleadings, and in light of the six factual items earlier noted as deemed to be without substantial controversy, that plaintiff was not entitled to money damages even if the court were to rule that there had been an abridgement of plaintiff's constitutional free speech and free press rights;

hence, the prohibition of any references thereto in the presence of the jury.[15]

In other words, plaintiff contends that the trial court erred in denying it the opportunity to put on evidence of the damages which it incurred as a result of the abridgement of its right of free speech, and we assume, for the sake of analysis, that the plaintiff has suffered actual,

---

[15]The following is a full text of the court's remarks made at the time of the December 5, 1977, ruling:

"There remains the one question of the motion to exclude from the jury references to Plaintiff's claim of violation of or infringement of the rights, that is, the alleged constitutional rights of free press. And the motion is to exclude reference to that in voir dire, opening statements, evidence, argument or other proceedings before the jury....

"All right. The motion is granted.

"Now, let me elaborate on that. The motion to exclude from the jury references to the Plaintiff's claim of the violation of [its] constitutional rights is granted.

"If such a violation occurred, it does not give the right to damages in the Plaintiff. There are insufficient allegations in the Complaint to bring the Plaintiff's claim under the provisions of the Federal Civil Rights Act, the 1983 sections, and that is, the provision under Federal law that would have to be—with which we would have to be concerned if the Plaintiff were asserting a right to damages because of the claim of the violation of the right to a free press by virtue of the fact that they were precluded from delivery within the gates of Leisure World Laguna Hills.

"The Complaint does not allege facts that would show any conduct under color of State law or statute or ordinance or custom, as is required by that act. It would appear that the initial conduct that is alleged did occur beyond the date that the statute would permit an action for recovery, that is, sometime in 1967, and the Complaint was filed in 1973. The question of whether or not the Defendants should be restrained from excluding Plaintiff from the grounds of Leisure World Laguna Hills is before the court and is properly a question for the court to decide, that is, should an injunction issue? And I anticipate that when the matter is submitted to the jury on the Cartwright assertions, that is, the assertions under the Cartwright Act, and the assertions under the Unfair Trade Practices Act, if there is other evidence that any party wants to present to the court on the issue of whether or not the injunction should issue after the jury has the case, you may present any additional evidence that has to do with the item of the injunction.

"The question under the State Constitution, that is, assuming there is an assertion of a violation of constitutional rights, should there be a right to recover damages in a State court because the allegations are that it violates the State Constitution. When there is an assertion of an inverse condemnation by the State, clearly, there is a right to recover damages because that is compensation for the taking of property. But in those instances where there is an assertion of violation of free press or free speech, there is no State statute on that subject. There is a State statute that gives the right to damages on a violation of the civil rights, and that is the Unruh Act. The legislature saw fit to enact the Unruh Act and give the right to damages for a violation of civil rights, but I don't believe the California Constitution is self-executing in other circumstances.

"So, we will proceed to trial on the Plaintiff's claim for damages under the Unfair Trade Practices Act, and under the allegations of violations of the Cartwright Act, and on the Cross-Complaint where the Cross-Complainant is asserting, at least, some acts that they contend are also a violation of the Unfair Trade Practices Act and the Cartwright Act."

demonstrable, compensatory damages arising solely from its exclusion from Leisure World and could have proved such damages had it been permitted to put on such evidence.

The issue, as posed by the parties' briefs, therefore, is whether the free speech clause of the California Constitution (art. I, § 2) affords a right to money damages without the benefit of enabling legislation.[16]

Passing for the moment that both the plaintiff and the trial court have mistakenly equated the right to money damages for a constitutionally defined grievance with the "self-executing" nature or lack of it in the California Constitution, we note that great emphasis is placed by plaintiff on the right-to-privacy cases as supporting its position.

In *Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825 [134 Cal.Rptr. 839], dealing with the new state constitutional provision assuring the individual right to privacy (art. I, § 1), the court said, "The constitutional provision is self-executing; hence it confers a judicial right of action on all Californians. (*White v. Davis, supra,* 13 Cal.3d at p. 775 [120 Cal.Rptr. 94, 533 P.2d 222].) Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone. [Fn. omitted.] (See *Annenberg v. Southern Cal. Dist. Council of Laborers* (1974) 38 Cal.App.3d 637...." (*Id.* at pp. 829-830.)

In *Porten* the plaintiff sought damages against the University of San Francisco for its alleged infringement of his right to privacy when it disclosed to a state agency his grades earned at Columbia before transferring to San Francisco. In applying the rule above recited, the appellate court reversed the trial court's judgment of dismissal after sustaining of a general demurrer. From this we conclude that plaintiff was thereafter afforded an opportunity to put on evidence of any damages he had suffered by reason of the infringement upon his constitutional rights to privacy.

The self-executing nature of the constitutional provision above noted as recited in *Porten* was confirmed in passing by Justice Sims in

---

[16]Plaintiff's brief argues its right to money damages in terms of whether the state Constitution is "self-executing." This approach begs the question. We have already deemed it to be "self-executing" to the extent that injunctive relief is available without the need for enabling legislation.

*Emerson* v. *J. F. Shea Co.* (1978) 76 Cal.App.3d 579, 591 [143 Cal. Rptr. 170]. It is also recognized with approval by Witkin. He writes, "... it has been declared that a [state] constitutional provision will now be presumed to be self-executing, and will be given effect, without legislation, unless it clearly appears that this was not intended." (5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 38, p. 3278.)

Having moved through this exposition of cases dealing with the right-to-privacy amendment to the California Constitution, we must observe that the issue remains, without more, unresolved; after all, *White* v. *Davis, supra*, 13 Cal.3d 757, 775, the leading case which passed upon and construed the consequences of the new amendment, and upon which *Porten* relied, was an *injunction* case.

Here, we part company with our decision after the first rehearing. In that opinion we proceeded to discredit *Porten* as authority by way of analogy for allowing money damages for violation of other state constitutional rights because, as we stated, the right to privacy had previously existed as a *common law* right.

In its current petition for rehearing, the plaintiff has effectively demonstrated that we were wrong in such latter pronouncement, and we must therefore retract it. In such petition plaintiff has directed our attention to *Melvin* v. *Reid* (1931) 112 Cal.App. 285 [297 P. 91], which reversed a judgment of dismissal, after a demurrer had been sustained, in an action which included a count for damages brought over 50 years ago under section 1 of article I of the California Constitution and based on allegations that a right of privacy had been illegally encroached upon. This, of course, was long before the 1973 amendment construed by *White*, relied upon in *Porten*.

In the course of its decision, the *Melvin* court categorically rejected the suggestion, insofar as California is concerned that a right of privacy existed as common law. The court went on to say, "We find, however, that the fundamental law of our state contains provisions which, we believe, permit us to recognize the right to pursue and obtain safety and happiness without improper infringements thereon by others. [¶] Section 1 of article I of the Constitution of California provides as follows: 'All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property; and pursuing and

obtaining safety and happiness.' [¶] The right to pursue and obtain happiness is guaranteed to all by the fundamental law of our state. This right by its very nature includes the right to live free from the unwarranted attack of others upon one's liberty, property, and reputation. Any person living a life of rectitude has that right to happiness which includes a freedom from unnecessary attacks on his character, social standing or reputation.... We believe that the publication by respondents of the unsavory incidents in the past life of appellant after she had reformed, coupled with her true name, was not justified by any standard of morals or ethics known to us and was a direct invasion of her inalienable right guaranteed to her by our Constitution, to pursue and obtain happiness. Whether we call this a right of privacy or give it any other name is immaterial because it is a right guaranteed by our Constitution that must not be ruthlessly and needlessly invaded by others." (*Id.* at pp. 291-292.)

From the foregoing, it is too plain for argument that our state Constitution has been interpreted to support an action for damages for a violation of rights arising under old section 1, article I, and that such an action was possible without the need for enabling legislation. In reliance thereon and because of the *special dignity* accorded the rights of free speech and free press under the California Constitution, whether they be described as "inalienable" rights or not, it is not illogical in view of *Melvin* to hold, which we do, that a direct right to sue for damages also accrued here by reason of plaintiff's exclusion from Leisure World, and that it accrued under article I, section 2 of the California Constitution.

Counsel for plaintiff has persuasively pointed out further, accepting that plaintiff has suffered a violation of its state constitutional rights, that Civil Code sections 1708 and 3333 together also provide a predicate for recovery of money damages in instances of such violations.

Section 1708 provides that "[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights."

Section 3333 provides that "[F]or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

The question then is whether the constitutionally protected right of plaintiff which we have held to have been violated comes within the ambit of section 1708. We can find no good reason why it does not, and so as pointed out by plaintiff, it follows "as night follows day," that a violation of that right imports by reason of section 3333 a correlative right to recover any damages proximately resulting from the violation of such right, keeping in perspective that we regard the constitutional violation here as having arisen from plaintiff's discriminatory exclusion from Leisure World with the implicit sanction of *state action* behind such exclusion.

Based upon the foregoing, it was error for the trial court to foreclose the plaintiff's right to present evidence of damages it sustained as allegedly arising from the unconstitutional exclusion of its newspaper from Leisure World.

### III

■ Having concluded that it was constitutionally impermissible for Golden Rain to discriminate against plaintiff's newspaper by excluding it from Leisure World, we next decide whether the trial court, upon a new trial, should entertain plaintiff's efforts to prove damages on the further theory that Golden Rain and Golden West allegedly acted in concert unconstitutionally to limit access to Leisure World only to the Leisure World News to the exclusion of plaintiff's newspaper and thereby brought about an unreasonable restraint of trade.

The plaintiff in its opening brief argues that the error of December 5, 1977, was also compounded because plaintiff was not allowed to introduce evidence in support of or to argue to the jury a theory of relief based upon a "conspiracy to deprive plaintiff of [its] constitutional rights [of free speech] as overt acts" such as to qualify as a violation of the Cartwright Act.

Referring to the trial already had, it logically followed, in view of the trial court's order *in limine*, that the jury did not consider the wrongful discriminatory exclusion from Leisure World of plaintiff's newspaper as an element in connection with its finding or not finding a conspiracy or combination resulting in an unreasonable restraint of trade as alleged by plaintiff in the fourth amended complaint. However, because we have concluded that such discriminatory exclusion was wrongful, it nec-

essarily follows that the court erred in applying its December 5, 1977, order so as to prevent the plaintiff from adverting in the presence of the jury to the constitutional deprivation as an element of its theory of grievance against both defendants. This limitation was necessarily reflected in a refusal to instruct the jury in keeping with what we have here held to be plaintiff's unconstitutional exclusion from Leisure World.

In arguing the Cartwright Act phase of the case to us, defendant has repeatedly asserted that an illegal restraint of trade does not require that the overt acts of the individuals themselves be illegal. While this may be true as a general proposition, it is an irrelevant if not diversionary argument here. As we understand plaintiff's position, it contends that the trial court erred in preventing it from arguing the *unconstitutional* nature of plaintiff's exclusion as only one element for the jury to weigh in deciding whether the restraint implicit in the exclusion was unreasonable. We agree. In other words, just because an unreasonable restraint *can arise* from *legal* overt acts does not mean that an unreasonable restraint *cannot* arise from *illegal* overt acts.

Thus, there can be no question that the discrimination against the Laguna News-Post in the form of its unconstitutional exclusion from Leisure World presented an additional circumstance which the jury should have considered under such instructions as would have enabled it to decide if there had been acts in concert by two or more persons to carry out an unreasonable restraint on trade or commerce. (Bus. & Prof. Code, § 16720.) If the jury were to find that there were such an unreasonable restraint, then the consequences thereof would be governed by Business and Professions Code section 16750 under which the jury would be entitled to decide further whether the plaintiff was injured in its business by reason of any such unreasonable restraint found to have occurred as defined by Business and Professions Code section 16720.

Because of the error of the trial court at the outset as represented by its order of December 5, 1977, all of the urgings of Golden West in its petition for rehearing about there being substantial evidence to support the jury's verdict which held against plaintiff on its theory of an illegal combination in restraint of trade are meaningless. The ground rules under which the jury decided the case were wrong, and plaintiff, should it seek a new trial, is entitled to try to prove that Golden West participat-

ed in influencing Golden Rain's *unconstitutional* exclusion of the plaintiff's newspaper from Leisure World and to try to prove additionally that this resulted in an unreasonable restraint of trade which proximately caused damages to the plaintiff for the applicable period not barred by the statute of limitations.

Unless there were such complicity which resulted in an unreasonable restraint of trade and commerce, no violation of section 16750 of the Business and Professions Code occurred. Otherwise, even though the appeal has been dismissed as to Golden West, plaintiff is still entitled to pursue the foregoing theory against Golden Rain as a possible participant in the alleged conspiracy.

### The Remaining Issues

On the factual issues actually tried to the jury on the cross-complaint under the Cartwright Act and the Unfair Trade Practices Act, there was substantial evidence abounding to sustain the jury's verdicts on the cross-complaint, and we see no good purpose to be served in pursuing a detailed recitation of such evidence. The judgment in that respect is affirmed.

### Disposition

Item No. 5 deemed to be without substantial controversy is stricken, there being absolutely no evidence in the record to support such a determination. Insofar as the judgment denied plaintiff's application for an injunction to terminate its exclusion from Leisure World, the judgment is reversed with directions. The trial court is directed to enter a new and different judgment granting such application on terms and conditions substantially as follows: For so long as Golden Rain or any other entity, exercising a power of control over the right of entry into Leisure World, authorizes or suffers the unsolicited, live carrier delivery of any giveaway type newspaper, including the Leisure World News, to any residence in Leisure World where any occupant thereof has not personally requested or subscribed to such delivery, the plaintiff shall be entitled to enter Leisure World for the purpose of delivering its newspaper, unsolicited, to any such residence in Leisure World, provided nevertheless that such delivery shall be under the same rules and regulations as to time, place, and manner as apply to the delivery of e.g., the Los Angeles Times and other newspapers offered for sale to subscribers, and provided further that if any resident of Leisure World shall expressly

state in writing to Golden Rain or to the management of Leisure World that he or she does not wish to receive unsolicited delivery of the Laguna News-Post to his or her residence, then plaintiff shall refrain thereafter from any delivery to that resident. In this latter instance, plaintiff shall be entitled to verify independently by telephone call or personal visit that any given resident does not wish to receive unsolicited delivery of the Laguna News-Post.

Because we have decided that plaintiff's exclusion from Leisure World was unconstitutional discrimination and therefore wrongful as a matter of law, the trial court is further directed, upon due application of plaintiff, to try, with a jury if requested, those issues of damages arising from the illegality of the exclusion of the Laguna News-Post from Leisure World, namely: (1) whether plaintiff suffered any damages caused by its illegal exclusion from Leisure World as measured by sections 1708 and 3333 of the Civil Code; (2) whether there was any concerted action or agreement between Golden Rain and Golden West, per section 16720, subdivision (a) of the Business and Professions Code, which caused the unconstitutional exclusion of the Laguna News-Post from Leisure World such as to constitute an unreasonable restraint of trade; and (3) whether there were any actual damages proximately resulting from any such unreasonable restraint of trade over the four years next preceding the filing of the action for assessment per section 16750.1 of the Business and Professions Code.

Except as reversed with directions above, the judgment is affirmed, and each party shall bear its own costs on appeal.

Gardner, J.,* concurred.

KAUFMAN, Acting P. J., Concurring and Dissenting.—Somewhat reluctantly,[1] I concur in the opinion and judgment except insofar as it holds that a discriminatory violation of a newspaper's constitutional right to freedom of the press gives rise to a direct cause of action for damages outside the parameters of recognized tort law and independent of the statutory law dealing with unlawful restraints of trade and unfair business practices. Not a single case or authority so holding is cited for that novel proposition, and the authorities that are cited in support of it are neither compelling nor persuasive.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1]My reluctance is based on my agreement with the majority (see majority opn., *ante*, pp. 847-848, fn. 14) that this case really involves nothing more than a commercial dispute between two entities engaged in the newspaper business and my regret that plain-

Even if the majority were correct that the provision in the California Constitution guaranteeing freedom of the press (art. I, § 2, subd. (a)) is self-executing, that would not automatically and necessarily result in the conclusion that a violation of that right gives rise to a cause of action for damages. Self-executing means no more than that the constitutional right will be enforced without enabling legislation. The fact that a constitutional provision is self-executing does not establish the remedies that are available for its enforcement. Injunctive or declaratory relief may be available to the exclusion of money damages.

Moreover, it is clear that the free press provision of the California Constitution is not self-executing, at least in the sense that its violation gives right to a direct cause of action for damages. Subdivision (a) of section 2 of article I provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. *A law may not restrain or abridge liberty of* speech or *press*." (Italics added.) A constitutional provision may be regarded as self-executing "if the nature and extent of the right conferred and the liability imposed are fixed by the Constitution itself, so that they can be determined by an examination and construction of its terms . . . ." (*Taylor* v. *Madigan* (1975) 53 Cal.App.3d 943, 951 [126 Cal. Rptr. 376]; accord; *Chesney* v. *Byram* (1940) 15 Cal.2d 460, 462 [101 P.2d 1106]; *Flood* v. *Riggs* (1978) 80 Cal.App.3d 138, 154 [145 Cal. Rptr. 573].) Obviously, the language "a law may not restrain or abridge liberty of . . . press" falls a bit short of fixing the "extent of the right conferred" and, a fortiori, "the liability imposed." Indeed, inasmuch as the prohibition is against abridgement of the right by "[a] law," it is problematical whether the constitutional provision has any application to the conduct of nongovernmental entities.

The last observation is pertinent also to the fundamental distinction between the case at bench and the right of privacy cases cited by the majority. The initiative constitutional amendment to section 1 of article I of the California Constitution, adding privacy to the enumerated inalienable rights,[2] had a unique "legislative" history that indicated the

plaintiff has been successful in importing into the dispute the revered constitutional right of freedom of the press. Although I find it difficult to argue with the logic of the discussion of constitutional issues in the majority opinion, I have the uneasy feeling that by right this case should not, and in fact does not, involve the grave constitutional concerns confronted in the majority opinion.

[2]The language of article I, section 1, of the California Constitution is: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

provision was meant to protect the right of privacy against unlawful intrusions by either governmental or private entities and was intended to be enforceable without more. (See *White* v. *Davis* (1975) 13 Cal.3d 757, 773-776 [120 Cal.Rptr. 94, 533 P.2d 222]; *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 829 [134 Cal.Rptr. 839].) The courts in both the *White* and *Porten* decisions relied entirely on that unique "legislative" history in determining that the provision establishing an inalienable right to privacy was self-executing and, apparently in *Porten*, that its violation gives rise to a direct cause of action for damages. Thus those decisions constitute no authority for a damage action based on article I, section 2, subdivision (a). Neither does the observation in *Emerson* v. *J. F. Shea Co.* (1978) 76 Cal.App.3d 579, 591 [143 Cal.Rptr. 170], that in *White* the court indicated that the constitutional amendment adding privacy to the list of inalienable rights was intended to be self-executing.

Civil Code section 3333 is not a substantive statute; it merely prescribes the general measure of damages in tort cases. Civil Code section 1708 which provides that every person is bound to abstain from injuring the person or property of another or infringing any of his rights, states a general principle of law, but it hardly provides support for the adoption of the novel legal proposition that a violation of subdivision (a) of section 2 of article I of the California Constitution gives rise to a direct cause of action for damages outside the parameters of recognized tort law and independent of the statutory law governing unlawful restraints on trade and unfair business practices.

A petition for a rehearing was denied June 16, 1982, and respondent's petition for a hearing by the Supreme Court was denied August 18, 1982.